**UNITED STATES of America, Plaintiff-Appellee, Cross-Appellant,**

v.

**Gary BOWDACH, Defendant-Appellant, Cross-Appellee.**

**No. 76–2258.**

United States Court of Appeals, Fifth Circuit.

Oct. 26, 1977.

Rehearing and Rehearing En Banc Denied Nov. 28, 1977.

1162

Jackson B. Battle, Laramie, Wyo. (Court-appointed), for defendant-appellant, cross-appellee.

Gary Bowdach, pro se.

Jack V. Eskenazi, Asst. U. S. Atty., Gary L. Betz, Sp. Atty., U. S. Dept. of Justice, Miami, Fla., for plaintiff-appellee, cross-appellant.

Before THORNBERRY, GODBOLD and FAY, Circuit Judges.

FAY, Circuit Judge:

The defendant-appellant, Gary Bowdach, a previously convicted felon, was convicted by a jury of three counts of receiving weapons in violation of 18 U.S.C.App. § 1202(a). The district court, Judge Norman Roettger presiding, granted the defendant's motion for judgment of acquittal as to Count III of the indictment. The United States properly filed a petition to find the defendant a dangerous special offender pursuant to 18 U.S.C. § 3575. The district court, after holding a hearing and finding the defendant to be a dangerous special offender, sentenced the defendant to five years imprisonment on Counts I and II to run concurrently with each other, but consecutive to a fifteen year sentence the defendant is now serving. On appeal, the defendant raises several issues including: 1) the validity of his arrest by state police officers who were executing a federal arrest warrant; 2) the constitutionality of the subsequent search of his apartment under the guise of a security sweep and; 3) the constitutionality of the federal dangerous special offender statute. In addition to the issues raised by the defendant, the United States appeals the district court's granting of the judgment of acquittal as to Count III of the indictment. Finding no reversible error as to any of the points raised on appeal, we affirm the judgment of the district court.

## I. FACTS

The rather lengthy facts of this case were set out in great detail by Judge Roettger, (see United States v. Bowdach, 414 F.Supp. 1346 (S.D.Fla.1976)) and, for the most part, are not challenged by the defendant. Our recitation of the facts is, therefore, drawn primarily from Judge Roettger's well-written opinion.

In 1971, the defendant was convicted of eight counts of extortionate extensions of credit in violation of 18 U.S.C. §§ 892 and 894. The defendant was originally denied bond pending appeal of these convictions by United States District Court Judge C. Clyde Atkins because the defendant was found to be a danger to the community. In July of 1973, the defendant moved again for release pending appeal of the extortionate credit convictions, and, after hearings were held, Judge Atkins granted bond to the defendant and retained jurisdiction. The defendant was subsequently released on this bond from the Atlanta Penitentiary in November 1973. In December of 1973, the district court added conditions to the defendant's bond requiring him not to associate with convicted felons and not to commit violations of state or federal laws while out on bond.

On December 16, 1974, the Government filed a motion with Judge Atkins to revoke the defendant's appeal bond and to issue a warrant for his arrest. The motion was supported by the affidavit of Special Agent Gersky of the F.B.I., which recited in great detail why the defendant was a danger to the community and likely to flee the jurisdiction of the United States. The affidavit recited, among other things, that two reliable confidential sources stated the defendant was a narcotics smuggler and dealer, and, in addition, was a professional killer in the employ of Rick Cravero (who has since been convicted of murder and conspiracy to distribute narcotics). The sources indicated that defendant kept a rifle, several pistols, and a silencer with him at all times, and that he had stated he would flee the country if his extortion conviction was affirmed (which it ultimately was). Judge Atkins announced to Gersky that he was going to issue a warrant for the defendant's arrest and revoke the bond. This was, in fact, done the same day.

Special Agent Gersky told Sgt. Havens of the Dade County Public Safety Department that a warrant had been issued for the defendant's arrest, but that he was unable to locate the defendant. Sgt. Havens was in charge of the investigation of the "Cravero gang" which had been underway since May, 1973. Defendant and several of his known associates were subjects of this investigation. On December 17, 1974, the Federal Grand Jury sitting in Ft. Lauderdale, Florida, returned an indictment against Cravero and seventeen other persons for conspiracy to distribute 52 kilos of cocaine and several thousand pounds of marijuana. The defendant was not one of the eighteen persons indicted. The indictment was sealed pending the arrest of the individuals because it was the plan of law enforcement officers to arrest all persons named in the indictment during the evening of December 18 lest some of them learn of it and flee the country.

On December 18, 1974, Detectives Jane Kelly and Dave Saleeba, two Dade County police officers, had defendant's house under surveillance. When defendant left in mid-afternoon, he saw them, stopped and got out of the car to look at them sitting about 100 feet away in the cemetery, but then drove off. The officers next located defendant's car at Cravero's residence in Hollywood around 8 o'clock. Bowdach left in his car with two other persons, described as males with shoulder-length hair, both thin and having brown hair, one with a lighter shade of brown. Sgt. Havens suspected the persons accompanying defendant were Paul Jacobson and Kenneth Townsend, both named as defendants in the sealed indictment. Defendant had frequently been in the company of Jacobson who was under another indictment and investigation at that time. Defendant left Cravero's residence, drove at a high rate of speed on side streets, and eluded the detectives. They searched at various likely places where they hoped to make contact again with defendant, but failing to do so they returned to defendant's residence.

Meanwhile, at defendant's residence four other officers had set up surveillance at approximately 8:00 P. M. Two officers were in front of the apartment and two in the rear most of the time. The two officers in the rear of the apartment were unable to position themselves so as to command a clear view of the rear door. However, they felt they would see anyone leave by the rear door by a beam of light coming from the well-illuminated house in the event anyone opened that door. Between 8:30 P. M. and 9:30 P. M. Detectives Kelly and Saleeba returned from Hollywood and were added to the surveillance forces. At 9:30 P. M. another officer radioed Havens that defendant and two males of a thin build, 5′7″ to 5′9″, and shoulder-length hair were observed outside defendant's residence where they opened the trunk of his Cadillac. They stayed outside only a short time, although one of the three men actually got into the trunk. They returned to the house and then came back out approximately five minutes later and again went to the Cadillac.

When Sgt. Havens arrived about 10 o'clock he began to plan the strategy to arrest Bowdach and also the other two individuals who he believed to be Jacobson and Townsend, all without having the matter result in danger to anyone. In the time since 9:40, approximately the last time the trio returned to the apartment, none of the six-plus police officers had seen anyone leave the apartment, either by the front or rear doors.

What Havens didn't know was that in the evening or on the way from Cravero's home the defendant and his wife had made several purchases: a 12-gauge pump shotgun and a Colt .357 Magnum revolver (which are the objects of the motion to suppress), and a police band radio scanner. Defendant wasn't using the scanner, but did so after receiving a phone call from one Bobby Miller, who had advised Bowdach that the Organized Crime Bureau not only had his house surrounded, but they had been following him all day and were talking about it on the radio. Armed with this bit of counter-intelligence defendant made a bold move: he called the Dade County police and

requested assistance alleging that there were a "bunch" of black males armed with shotguns who were trying to force their way into his house. The call was received at 10:08 P. M. and a unit dispatched at 10:11 P. M. Police Officer Snyder arrived at 10:20 P. M., much to the surprise of Sgt. Havens and his surveillance crew which numbered over 10 officers at this time.

Shortly after entering the house, Officer Snyder and the defendant walked out of the house and Sgt. Havens ran to the front of the house as the door closed; he distinctly remembers hearing the door lock. He announced his identity and that a warrant had been issued for Bowdach and placed defendant under arrest.

At this moment Sgt. Havens heard a shout from the back of the house to the effect: "Look out—they have a shotgun." He asked who was inside and the defendant replied no one was. Havens turned to Mrs. Bowdach to inquire and defendant told her to shut up. Then came a shout from a female voice which Havens recognized as Detective Kelly's: "Look out, there are shadows in the house."

Sgt. Havens and Officer Snyder locked defendant inside Snyder's police cruiser and then Havens ran to the apartment building. He flattened himself against the wall under the only window on that side and edged around the building to the rear. He could see five or six police officers with guns drawn, either crouching or in covered positions; the police officers were pointing to the windows or the rear door.

Mrs. Bowdach came around to the rear of the house but refused to open the rear door or permit Havens to go in. Havens told her he had warrants for the arrest of persons who were inside and he had to go in to see if they were there and, if so, make the arrests, and also to make sure the police wouldn't get shot as they left. Sgt. Havens also testified that at this point he was very concerned about the safety of the police officers and the safety of the neighbors who were beginning to emerge from nearby apartments.

Mrs. Bowdach remained adamant despite Havens' promise not to search the residence. Havens then yelled several times: "Police officers—come out!" After failing to hear a response, Havens, with the help of a Detective Stone, kicked in the door. Havens inched inside and directly ahead of him, leaning up against the counter in a breakfast nook, was a 12-gauge pump shotgun. He ejected a shell from the chamber and gave the gun to the officer directly behind him. He looked around the downstairs, searched behind the sofa and in potential hiding places for persons he thought were there, viz., Jacobson and Townsend. Then Havens moved to the stairs. He yelled up the stairwell: "Police officers—come down!" Silence. Havens crawled up the stairs to present a lower target and made his way into a large bedroom. On top of the dresser he could see shotgun shells, .357 cartridges, and empty holsters.

After quickly searching the large room he went to the other room. When he opened the door he was startled to see two children sitting up in bed. He told them to be still and stay in their beds; and he left. He insisted that he completed his entire search of the apartment in one to two minutes, although the trial court concluded that it must have taken nearly five minutes.

After seizing the shotgun, agents of the Treasury Department traced its serial numbers to Gene's Sporting Center in Hollywood, Florida. There it was determined that in the late afternoon of December 18, 1974, the shotgun had been purchased in the name of Bowdach's wife, in defendant's presence. It was also revealed that a Colt .357 Magnum revolver had been purchased at that same time, also in the name of Bowdach's wife.

## II. SUPPRESSION

The defendant's principal allegation on appeal is that evidence seized from the defendant and its fruits should have been suppressed. The defendant bases this allegation initially on the grounds that the arrest of the defendant was illegal. The defendant alternatively asserts that even if

the arrest was valid, the subsequent search of the defendant's residence was improper.

### A.

The defendant sets forth three reasons why he believes that his arrest was illegal. He first alleges that the *ex parte* modification and subsequent *ex parte* revocation of his appeal bond was unconstitutional, and, therefore, the issuance of the arrest warrant was improper. The defendant properly asserts that he had a liberty interest at stake when the district court considered modification and revocation of his appeal bond. What the defendant misstates is the procedural protections which were due to him during these procedures.

Title 18 U.S.C. §§ 3146 and 3148 govern the granting, modification, and revocation of release pending appeal. Section 3148 provides that a court or a judge shall release or detain a person according to the provisions of § 3146 even though that person has been convicted of an offense and is either awaiting sentence or has filed an appeal (or a petition for a writ of certiorari) unless the court has reason to believe that no one or more conditions of release will reasonably assure that the person will not flee or pose a danger to any other person or to the community. Section 3146 provides that a judicial officer, upon a determination that the defendant's release upon his own recognizance will not assure his appearance, may impose any reasonable conditions necessary to assure the defendant's appearance as required. The judicial officer is given the power to amend his order at any time in order to impose additional or different con-

ditions of release even if these conditions result in the defendant having to remain in custody. 18 U.S.C. § 3146(e). However, a person for whom conditions of release are imposed and who, after twenty-four hours from that time, still remains in custody, is entitled to a hearing and have the conditions of release reviewed by the judicial officer who imposed them. 18 U.S.C. § 3146(d).

 The procedural protections provided for in §§ 3146 and 3148 fully meet the due process requirements of the Constitution. The defendant claims that due process was not satisfied even though hearings were held immediately after his arrest to determine whether his bond should be permanently revoked. The defendant suggests that he was entitled to notice and hearing prior to any revocation of his bond—albeit only a temporary revocation. Defendant's approach would ignore the exigent circumstances surrounding this revocation. In this instance, the government sought to revoke an appeal bond because it felt the defendant was preparing to flee, and because it considered the defendant dangerous to the community. In situations such as these, the only way to safeguard the community and assure the defendant's appearance is an immediate, but temporary, revocation of his appeal bond and issuance of an arrest warrant.[1] Due process is satisfied by the granting of a hearing immediately after the person is brought into custody in order to determine whether the bond should be permanently revoked. This procedure is perfectly consistent with *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36

---

[1]. The defendant also raises as error on appeal the district court's issuance of an arrest warrant. The defendant claims that even if bond may be temporarily revoked ex parte, no authority exists for issuance of an arrest warrant. He claims that the proper procedure to be followed is either the service of a summons or delivery of a court order to appear for a hearing to show cause why the bond should not be revoked. Federal Rule of Criminal Procedure 4(a) provides that an arrest warrant shall issue when there is probable cause to believe an offense has been committed and the defendant committed it. The underlying reason for the issuance of the arrest warrant was that the

defendant had committed an offense against the United States—receipt of firearms in violation of 18 U.S.C.App. § 1202(a)(1), and was felt no longer suited for release pending completion of the appellate process. Consequently, the arrest warrant was properly issued. The alternative the defendant sets forth is not satisfactory. The defendant would have the government notify a person who it possibly feared would flee, and inform that person that the Government was seeking to revoke his appeal bond. The most likely result of such a procedure would be simply to accelerate that person's plans to evade the federal authorities.

L.Ed.2d 656 (1973), which the defendant cites in support of his position. In *Gagnon*, the Supreme Court held that revocation of parole is a substantial loss of liberty and, therefore, the parolee is entitled to due process. However, what this due process mandates is a granting of a hearing *at the time of the parolee's arrest* in order to determine whether there is probable cause to believe that the person has committed a parole violation, and then a more complete hearing at a later date. In *Gagnon*, the parolee was not held to be entitled to any type of hearing prior to his arrest. Such a holding would have most likely frustrated any efforts of law enforcement officers to bring the parolee back into custody. That situation is similar to the case before us, and we find that an *ex parte* temporary revocation of an appeal bond is constitutional when followed by notice and hearing after the person has been brought into custody.

■ The defendant's second attack against the validity of the arrest alleges that the district court lacked jurisdiction to enter the initial temporary revocation order because once an appeal has been filed, a trial court, during pendency of that appeal, is without jurisdiction to enter orders in the case.[2] Title 18 U.S.C. §§ 3146 and 3148 directly grant the trial court jurisdiction as to matters concerning the release of the defendant pending the outcome of his appeal. 18 U.S.C. § 3148 states:

> A person . . . who has been convicted of an offense and . . . *has filed* an appeal or a petition for a writ of certiorari, shall be treated in accordance with the provisions of section 3146 unless

the court or judge has reason to believe that no one or more conditions of release will reasonably assure that the person will not flee or pose a danger to any other person or to the community.

It is clear from the language of the statute that Congress was cognizant of the fact that the trial judge might be making the decision concerning the defendant's release after the defendant had filed his appeal, and yet Congress still gave to the trial court the power to make these decisions. The district court, therefore, had jurisdiction to modify and revoke the defendant's appeal bond and committed no error in so doing.

■ The defendant's final attack against the validity of the arrest is that even if we assume that the appeal bond was properly revoked and that the arrest warrant was validly issued, the arrest was still improper since the warrant was improperly executed. The defendant contends that a state police officer has no authorization to execute a federal arrest warrant. Federal Rule of Criminal Procedure 4(d)(1) governs the execution of warrants and states specifically that a warrant shall be executed by a "marshal or by some other officer authorized by law." The defendant asserts that a state police officer is not "some other officer" authorized by law. We disagree.

The defendant cites us to a number of statutes which he believes are exhaustive of the persons authorized to execute warrants. The primary statute called to our attention is 18 U.S.C. § 3041, a part of Chapter 203 entitled, "Arrest and Commitment". 18 U.S.C. § 3041 deals with the power of the Courts and magistrates *to have* people arrested, and it provides in part that:

---

2. We think it is somewhat inconsistent for the defendant to be taking this position presently in that according to the Government's brief, he argued the exact opposite position in an earlier proceeding. The defendant was originally denied bond pending appeal of his convictions for extortionate extensions of credit by Judge C. Clyde Atkins on May 21 and June 7, 1971. The Court found that the defendant was a danger to the community. R. pp. 946–952. In July of 1973, the defendant moved again for bond pending appeal and after hearings were held, in which the defendant urged that the district

court had jurisdiction to grant bond, Judge Atkins granted bond to the defendant. (Sent H. pp. 64–65). If the defendant's position that the district court had no jurisdiction to modify and revoke the appeal bond is correct, then the district court's original granting of that bond after the defendant had effectuated an appeal was improper and the defendant had no legal right to his freedom. We, however, need not address this problem since we hold that the district court had jurisdiction to grant, modify and revoke the defendant's appeal bond.

For any offense against the United States, the offender may, by any justice or judge of the United States, *or by any United States magistrate, or by any chancellor, judge of a supreme or superior court, chief or first judge of common pleas, mayor of a city, justice of the peace, or other magistrate, of any state where the offender may be found,* and at the expense of the United States, be arrested and imprisoned . . . . .

■ Section 3041 does not deal directly with who is authorized to execute federal arrest warrants, but rather it deals with who has the power to have someone arrested for an offense against the United States. It would of course be absurd to suggest that the statute should be interpreted to mean that a mayor of a city, or a justice of the peace, has to execute the arrest personally and is not allowed to draw upon the law enforcement branch of his government. Such an interpretation would either seriously deplete the ranks of judges and mayors, allow many criminals to run free, or both. We feel that § 3041 indicates that state law enforcement officers have the power to arrest citizens for crimes against the United States, and this would be especially true when the state officers have knowledge of the fact that the person being arrested is wanted by the federal authorities and that a federal arrest warrant has been issued for that person's arrest. .

■ It is well established that absent an express federal statute defining who is allowed to execute federal arrest warrants, the validity of the arrest should be determined by the law of the state where the arrest took place. *United States v. Di Re,* 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948). We recognize that the arrest in *United States v. Di Re* was executed before any warrant for the defendant's arrest had been issued, but find the rationale is equally persuasive when a warrant has been issued. It would indeed be an illogical conclusion if we were to hold, as the defendant wishes us to do, that a state police officer must let a suspect go free when he has knowledge that the suspect is the subject of a federal arrest

warrant, but that officer may arrest the suspect if he has knowledge of the crime but no warrant has been issued. Such a holding would in effect punish the federal authorities for going before a neutral magistrate and obtaining an arrest warrant. Therefore, we conclude that the arrest of the defendant in this case by state police would be valid if authorized by state law. Florida Statute § 901.15 (1975) provides in part that a state police officer may arrest a person without a warrant when a felony has been committed and he reasonably believes that the person committed it or if a warrant for the person's arrest has been issued and is held by another peace officer for execution. The state officers here had more than a reasonable belief that the defendant had committed a felony—the officers knew that he was being sought because his appeal bond, which was issued after he had been *convicted* of a felony, had been revoked. The state officers also knew that a warrant for the defendant's arrest had been issued. Since the arrest of the defendant by state police officers was valid under state law, it is not subject to successful attack here.

### B.

■ The next error which the defendant assigns on appeal is that the search of the defendant's residence after his arrest was illegal, and, therefore, all evidence seized from the defendant's apartment and its fruits should have been suppressed. We disagree. The law in this circuit holds that police officers have a right to conduct a quick and cursory check of a residence when they have reasonable grounds to believe that there are other persons present inside the residence who might present a security risk. This is true whether the initial arrest of the defendant was made inside or outside the residence. *McGeehan v. Wainright,* 526 F.2d 397 (5th Cir. 1976); *United States v. Smith,* 515 F.2d 1028 (5th Cir. 1975). It should be noted that the purpose of this cursory search is to check for persons, not things, and the search is only justified when it is necessary to allow

the police officers to carry out the arrest without fear of violence. The exigent circumstances presented by this reasonable fear of violence distinguishes this factual setting from *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) and *Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970), in which the Supreme Court struck down *unnecessary* extended searches incident to lawful arrests. The district court found that the police officers reasonably feared for their safety. The defendant, along with Townsend and Jacobson, were alleged to be members of the "Cravero gang" which was the subject of an extended federal and state investigation at this time. The leader of this gang, Rick Cravero, has since been convicted of murder and importation of narcotics. In his published opinion, Judge Norman Roettger concluded that:

> The search of defendant's apartment in the instant case clearly qualifies as a security search. Although defendant was placed under arrest outside the apartment building, the police officers on the scene reasonably feared that other individuals still remained inside the building and that these individuals posed a threat to their safety and the safety of the neighbors. The scope of the search of the apartment was no broader than what was minimally necessary to protect the officers from the perceived danger. Although the security search ultimately revealed that there were no other dangerous individuals on the premises, the determining factor as to the legality of a search is the reasonable perceptions of the officers prior to entry, not what is actually found therein.

*United States v. Bowdach,* 414 F.Supp. 1346, 1352 (S.D.Fla.1976). Nothing in our search of the record reveals anything which might cause us to disagree with Judge Roettger's conclusion. Consequently, we hold that the search of the defendant's apartment was proper, and once legally inside the apartment, the shotgun, which was in plain view, was subject to seizure. *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

Since the search of the defendant's apartment is justifiable as a security search, it is not necessary for us to decide whether the search is also justifiable under *United States v. Cravero,* 545 F.2d 406, 420 (5th Cir. 1977), which held that when an officer holds a valid arrest warrant and reasonably believes that its subject is within premises belonging to a third party, the officer need not obtain a search warrant to enter the premises for the purpose of arresting that suspect. *Id.* at 421. The police officers in the case at bar searched the defendant's residence because they believed that two wanted suspects were inside the apartment. Sergeant Havens, the officer who executed the search, believed the two persons to be Jacobson and Townsend who the sergeant knew were then wanted under federal indictments handed down two days earlier. If the belief of Sergeant Havens as to the identity of these two people is considered reasonable, then the search of the defendant's apartment would be justified under *Cravero.* Judge Roettger refrained from deciding whether probable cause existed for the officers to believe that the individuals thought to be inside were actually Jacobson and Townsend. While we feel that there is sufficient evidence to support Sergeant Havens belief, it is not necessary for us to so hold since the search is otherwise justifiable as a security search.

### III. SPEEDY TRIAL

The defendant alleges that because of the one year delay between his arrest and the indictment, he was denied his Sixth Amendment right to a speedy trial. The defendant also argues that he was denied his right to a speedy trial because his motion to dismiss on these grounds was denied by a federal magistrate instead of an Article III judge. We find both allegations to be wholly without merit.

On February 3, 1975, the defendant moved to dismiss the cause of action for failure to afford a speedy trial. Eight days later, on February 11, 1975, the United States Magistrate denied this motion be-

cause the defendant failed to allege facts in his motion indicating how he had been prejudiced by the delay. The law in this Circuit is that while post-arrest pre-indictment delay is within the scope of the speedy trial guarantee, an indictment should not be dismissed "absent a showing of substantial prejudice to a fair trial . . . ." *United States v. Catano,* 553 F.2d 497 (5th Cir. 1977). The defendant in this case has not set forth facts sufficient to show "substantial prejudice". The defendant contends that because of the delay, the testimony of his wife and that of Kenneth Townsend was unavailable. The defendant, however, has made no allegation as to how the in Court testimony of these two witnesses would have aided his defense (*See United States v. Zane,* 489 F.2d 269 (5th Cir. 1973)) and the defendant also overlooks the fact that he in effect received the benefits of their testimony since the defense counsel was allowed to read into evidence the testimony of these two witnesses given at an earlier bond revocation hearing. This testimony was read into evidence over the Government's strenuous objection based allegedly upon the denial of the Government's right to effectively cross examine the witnesses. The Government hoped to elicit from Mrs. Bowdach exactly what expertise she had with 12 gauge shotguns and 357 magnums. A lack of expertise with these weapons would raise the obvious inference that it was the defendant, and not his wife, who actually received the weapons. We hold that the defendant was not substantially prejudiced by the one year delay in the issuance of the indictment, and, consequently, was not denied his Sixth Amendment right to a speedy trial. We also feel that there is no merit in the defendant's point as to the impropriety of a Federal Magistrate ruling on a motion to dismiss for a denial of a speedy trial. The Magistrate acted pursuant to the Local Rules for the United States District Court, Southern District of Florida. Rule 10 of

these rules provides in part that all motions in criminal cases other than motions for continuance and motions which require evidentiary support shall be referred to one of the United States magistrates. Rule 10 also provides that any party aggrieved by a Magistrate's ruling shall have the right to petition the district judge for a review of the magistrate's ruling and a hearing *de novo.* The defendant in this case never petitioned the district judge for a hearing after the magistrate denied his motion, nor did he raise at trial the magistrate's alleged lack of authority. For these reasons, we feel that the defendant has waived any objection which might exist as to the magistrate's lack of authority since the issue of the right to a speedy trial is nonjurisdictional in nature. *Saldana v. United States,* 505 F.2d 628 (5th Cir. 1974).

## IV. THE VALIDITY OF THE SENTENCE

 The defendant's final assignment of error[3] alleges that 18 U.S.C. § 3575, the "Dangerous Special Offender" statute, is unconstitutional on its face and as applied. The constitutionality of § 3575 is a question of first impression before this Court, and raises a number of difficult issues. Although there have been several district court cases discussing the constitutionality of the statute, only two circuit courts have rendered their opinion. The Sixth Circuit, in *United States v. Stewart,* 531 F.2d 326 (6th Cir. 1976), upheld § 3575 against constitutional attack. The Seventh Circuit, however, in *United States v. Neary,* 552 F.2d 1184 (7th Cir. 1977), while upholding part of the statute against constitutional attack, indicated in *dicta* that other parts of the act may be constitutionally infirm. After an exhaustive study of the act, we feel constrained to limit our discussion of § 3575 to that part of the statute which provides for an increased sentence for certain repeat offenders (18 U.S.C. § 3575(e)(1)). The en-

---

**3.** The defendant did raise one other assignment of error. The defendant charges that the trial judge erred in defining the word "possession" in his final charge to the jury. We find this assignment totally without merit. The defend-

ant himself submitted instructions in which the word "possession" was used. The court used these instructions, and acted properly in giving the jury the standard definition of possession as found in Devitt and Blackmar, § 13.10.

hancement provisions of the statute contained in section (b) can be triggered by meeting the requirements of subsections (e)(1), (e)(2), or (e)(3) if the Court is additionally satisfied that the defendant is "dangerous" as defined in section (f). Since it is our holding that the statute as applied to a person falling under (e)(1) is constitutional, we restrict our discussion to the statute as it applies to persons falling under that subsection and leave for another day the constitutionality of the act as applied to other categories of special offenders.

## A. AN OVERVIEW OF THE STATUTE

The first subsection of the statute, 18 U.S.C. § 3575(a), provides that the attorney prosecuting a federal felony can at a reasonable time before trial of the felony or acceptance of a guilty plea, file a notice with the court stating that he has reason to believe that the defendant (who must be over 21) is a dangerous special offender. This notice must set out with particularity the reasons why the prosecutor believes the defendant to be a dangerous special offender.

To be a "Special Offender" within the meaning of 18 U.S.C. § 3575(e), a defendant must fall within one of three categories. Under subsection (e)(1), a defendant is a special offender if he has two previous felony convictions, has been imprisoned for one of these felonies, and less than five years have elapsed between the commission of the present felony and the defendant's release from imprisonment or his commission of the last previous felony. Under subsection (e)(2), the defendant must have committed the triggering offense as part of a pattern of conduct which was criminal and which provided a substantial source of income to the defendant, and in which he manifested special skill or expertise. Under subsection (e)(3), the triggering offense must have been a conspiracy, or in furtherance of a conspiracy, involving three or more other persons in a pattern of criminal conduct. The defendant must have initiated, organized, planned, financed, directed, managed,

or supervised all or part of such conspiracy or conduct, or must have given or received a bribe or used force in the course of such conduct, or must have agreed to do any of the above. Once the elements of any one of the provisions of section (e) are met, section (f) becomes appropriate. It provides: "A defendant is dangerous for purposes of this section if a period of confinement longer than that provided for such felony is required for the protection of the public from further criminal conduct by the defendant." Even if the requirements of one of the subsections of (e) are met, the judge still must make an affirmative finding as to the dangerousness of the defendant under section (f) before an enhanced sentence may be imposed.

Section (b) provides the defendant with certain procedural protections including a hearing after trial but before sentence is imposed conducted by the court sitting without a jury. At this hearing, the defendant is entitled to the assistance of counsel, compulsory process, and cross-examination of any witnesses. He is also generally provided with a right to examine the presentence report. In certain "extraordinary" cases where the court may withhold information (including presentence reports) from the defendant, it must disclose that the information has been withheld and must place in the record its reasons for such action.

If it appears to the court by a preponderance of the information—including information submitted at the trial, the sentence hearing, and the presentence report—that the defendant is a dangerous special offender, the court shall sentence the defendant "to imprisonment for an appropriate term not to exceed twenty-five years and not disproportionate in severity to the maximum otherwise authorized by law for such felony". Otherwise, the court shall sentence the defendant in accordance with the law prescribing penalties for such felony. The court's findings, including an identification of the information relied upon and the reasons for the sentence imposed, must appear in the record, and are subject to complete review by the Court of Appeals. 18 U.S.C. § 3576.

## B. THE STATUTE'S CONSTITUTIONALITY

The primary constitutional attack against this sentencing statute is that its application results in a significant infringement of one's liberty interests, and, as a result, should not be utilized without first providing the defendant with full procedural due process protections. Accordingly, it is argued that a defendant should be provided with the same due process protections afforded an accused in an ordinary criminal trial—i. e., right to counsel, opportunity to be heard and to confront witnesses, right to cross examine, right to offer evidence, proof of all requisite facts beyond a reasonable doubt, and the right to have a jury determine all the facts which are necessary to trigger the implementation of the statute. While this view has legal merit,[4] we feel that the Due Process Clause does not mandate that *all* these procedural protections be present when a defendant is sentenced under the recidivist part of § 3575, and, consequently, the protections provided for within the statute are adequate.

Under normal sentencing procedures, a defendant is sentenced from probation up to the maximum provided for in the statute under which he was convicted. In this type of situation, a defendant is provided with minimal due process guarantees. The Supreme Court has explained in *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), its rationale for providing a defendant at sentencing with less than the full procedural protections:

> Under the practices of individualizing punishments, investigational techniques have been given an important role. Probation workers making reports of their investigations have not been trained to prosecute but to aid offenders. Their reports have been given a high value by conscientious judges who want to sentence persons on the best available information rather than on guesswork and

inadequate information. To deprive sentencing judges of this kind of information would undermine modern penological procedural policies that have been cautiously adopted throughout the nation after careful consideration and experimentation. We must recognize that most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination. And the modern probation report draws on information concerning every aspect of a defendant's life. The type and extent of this information make totally impractical if not impossible open court testimony with cross-examination. Such a procedure could endlessly delay criminal administration in a retrial of collateral issues.

*Id.* at 249, 250, 69 S.Ct. at 1084, 1085.

The defendant in this case, however, was not sentenced pursuant to normal sentencing procedures. Instead, the defendant was given an enhanced sentence as allowed for under a federal sentencing statute which in many ways is similar to the state enhancement statute which was struck down by the Supreme Court in *Specht v. Patterson,* 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967) for a failure to provide adequate due process protections.

In *Specht,* the defendant attacked the constitutionality of the Colorado Sex Offenders Act which came into play if the trial court found, on the basis of a psychiatric examination, that the accused, who had been convicted of a specified sex offense, would constitute a threat of bodily harm to the public, or was an habitual offender and mentally ill. The defendant attacked the constitutionality of the act because it allowed the trial judge to make his findings on the basis of undisclosed hearsay evidence, and without a hearing at which the

---

**4.** This view could easily be supported if we chose to interpret the Supreme Court's decision in *Specht v. Patterson,* 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), in that manner. As we discuss *infra,* we feel that this view is

not dictated by *Specht,* and that due process does not require at sentencing under § 3575(e)(1) all the procedural protections provided at trial.

defendant could confront and cross-examine adverse witnesses and present evidence of his own through compulsory process. *Id.* at 608, 87 S.Ct. 1209. The Supreme Court held that the Colorado procedure did not satisfy due process, and declined to extend the minimum due process approved in *Williams,* to an enhanced sentencing statute which could incarcerate a defendant from one day to life without any type of meaningful notice or hearing. The Court explained that the Sex Offenders Act did not make the commission of a specified crime the basis for sentencing, but rather it made "one conviction the basis for commencing another proceeding under another Act to determine whether a person constitutes a threat of bodily harm to the public, or is an habitual offender and mentally ill. That is a new finding of fact . . . that was not an ingredient of the offense charged." *Id.* Mr. Justice Douglas, writing for the majority of the Court, then stated that a defendant in such a proceeding is entitled to the full panoply of the relevant protections which due process guarantees in state criminal proceeding. He explained:

> Due Process, in other words, requires that he be present with counsel, have an opportunity to be heard, be confronted with witnesses against him, have the right to cross-examine, and to offer evidence of his own. And there must be findings adequate to make meaningful any appeal that is allowed.

*Id.* at 610, 87 S.Ct. at 1212.

Our inquiry today would be simplified if the law was not ever-changing. This is true because § 3575 has incorporated in it all the procedural protections outlined in *Specht* by Justice Douglas. However, Justice Douglas also said that the defendant should be entitled to the full panoply of due process protections which are guaranteed in state criminal proceedings. This language complicates the problem before us in that the *Specht* opinion predated the Supreme Court's decisions in *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491

(1968), and *In Re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), which made the proof beyond a reasonable doubt standard and the right to a trial by jury applicable to the states. We are, therefore, put into a position of deciding between one of three possible ways to handle this federal enhancement statute. First, we could limit *Specht* to the unique type of statute which was then being scrutinized, and hold that § 3575 is controlled by *Williams,* and, therefore, the defendant is only entitled to the minimal due process outlined in *Williams.* This type of analysis could possibly be justified if we place the emphasis of the *Specht* decision on the fact that the Colorado Act was completely devoid of any procedural protections, and gave the trial court too much leeway in sentencing discretion. However, this analysis glosses over the striking similarities between § 3575 and the Colorado Act. That is, both statutes provide for an increased sentence triggered by a separate conviction, neither statute is part of the usual criminal process stemming from a particular conviction, and both statutes involve less judicial discretion than ordinary sentencing because an increased sentence cannot be imposed without a new finding of fact. *See* Note, The Constitutionality of Statutes Permitting Increased Sentences for Habitual or Dangerous Criminals, 89 Harv.L.Rev. 356 (1975).

The second way we could handle this situation is to say that *Specht* controls, and the later Supreme Court cases providing for the reasonable doubt standard and the right to trial by jury are incorporated into that decision. This analysis would require us to hold the statute unconstitutional,[5] even though its implementation provides a result no different than ordinary recidivists statutes which have been held constitutional time and again. *See e. g., Gryger v. Burke,* 334 U.S. 728, 68 S.Ct. 1256, 92 L.Ed. 1683 (1948); *Graham v. West Virginia,* 224 U.S. 616, 32 S.Ct. 583, 56 L.Ed. 917 (1912); *McDonald v. Massachusetts,* 180 U.S. 311, 45

---

5. The reason the statute would be unconstitutional is that it only requires a "preponderance of the information" standard, and does not require a jury to make the requisite factual determinations—i. e., that the defendant is a recidivist and dangerous.

L.Ed. 542 (1901); *Moore v. Missouri,* 159 U.S. 673, 16 S.Ct. 179, 40 L.Ed. 301 (1895). The analysis also ignores the potential distinctions between the statute under review in *Specht* and the recidivist provision of § 3575—some of which distinctions are legitimate and not overly creative.[6]

▮▮ The final way in which to handle this situation is to limit *Specht* to the due process guarantees which are outlined in that opinion. By so doing, we are able to avoid having to rationalize the *Williams* and *Specht* opinions. Since § 3575 provides all the procedural protections specifically mandated by both *Williams* and *Specht,* we need not decide what procedural protections are the minimal amount necessary to satisfy due process, and we need only say that the protections provided for in § 3575 are adequate. The distinction is important because we are able to refrain from deciding whether or not the statute is governed by *Williams,* and thus would be valid even if it lacked some of the procedural protections it provides. We are, therefore, able to reconcile *Specht* and *Williams* without having to make haphazard interpretations as to what a "separate criminal proceeding" means, or exactly what constitutes a "new finding of fact." Our holding affects either of the cases only in the sense it limits the potential scope of *Specht* by saying that the Supreme Court would still not require the proof beyond a reasonable doubt standard and the right to factual determinations by a jury in a sentencing proceeding of a defendant under the recidivist portion of § 3575. We feel that this interpretation is warranted based upon some recent language of the Supreme Court,[7] and the rather apparent

**6.** Other than the total lack of due process provided for in *Specht,* another distinction between the two statutes is the one traditionally used to justify ordinary recidivist sentencing procedures. Under the Colorado Act, sentencing was based on a new finding of fact about the defendant's past conduct or criminal tendencies that was not an ingredient of the triggering crime. While § 3575(e)(1) allows the imposition of an increased sentence on new findings of fact (i. e. that the defendant is a repeat offender and is dangerous), it arguably permits evidence of past crimes only because it might be relevant in demonstrating circumstances that aggravate the latest offense, thus in some sense proving an element of that offense. *See* Note, "The Constitutionality of Statutes Permitting Increased Sentences for Habitual or Dangerous Criminals," 89 Harv.L.Rev. 356, 366 (1975). In any event, we have serious difficulty with the *Specht* decision if the key to the decision is the "new finding of fact" language. Sentencing judges are constantly making factual type determinations in regular sentencing procedures which are not elements of the crime for which the defendant is tried, and which undoubtedly do not require full procedural protections. For example, in *Williams,* the trial judge, before imposing the death sentence, relied on information in the presentence report that the defendant had previously committed thirty burglaries and possessed a "morbid sexuality." *Williams v. New York,* 337 U.S. 241, 244, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). This was no less a new finding of fact outside the scope of the crime charged than the ones which have to be found in order to implement the Colorado Act or the dangerous special offender statute. It is thus difficult for us to hold that because § 3575 requires a new finding of fact,

*Specht* mandates that it be found unconstitutional. If all new findings of fact require full due process protection, then we fail to see why ordinary sentencing procedures are exempt from this—even though we feel strongly that they are, and should be.

**7.** In *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), the Supreme Court, although unable to agree on an opinion, reversed the imposition of the death sentence imposed by a Florida trial judge after the jury returned a recommendation for a life sentence. The trial judge's decision was based partly on information contained in a presentence report which was not disclosed to the defendant. Justice Stevens, in an opinion joined by Justices Stewart and Powell, stated that "it is now clear that the sentencing process . . . must satisfy the requirements of the Due Process Clause." *Id.,* 358, 97 S.Ct. at 1205, 51 L.Ed.2d at 402. However, he went on to state that, "[t]he fact that due process applies does not, of course, implicate the entire panoply of criminal trial procedural rights." *Id.* In *Patterson v. New York,* —— U.S. ——, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), the Supreme Court discussed the scope of its decision in *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) which some commentators have read to mean that the proof beyond a reasonable doubt standard is mandated in sentencing proceedings. Justice White, writing for the majority of the Court, shed some light on this theory.

*Mullaney's* holding, it is argued, is that the State may not permit the blameworthiness of an act or the severity of punishment authorized for its commission to depend on the

fact that a person accused of being a recidivist (and, therefore, by analogy, one accused of being a special offender under (e)(1)) does not need the full due process protections afforded the accused in an ordinary criminal trial. This is so because usually the only additional evidence against one charged with being a recidivist are tangible court records, and the accused's only defenses are that he is not the person mentioned in the previous convictions or that the convictions are void. We see no reason why a defendant under (e)(1) needs more procedural protections than would a defendant being sentenced under any other recidivist provision, and we, therefore, refuse to extend that protection to those defendants being sentenced under § 3575(e)(1).

▮▮▮ The dangerous offender statute is also under attack because the term "dangerous" as used in § 3575(f) is alleged to be unconstitutionally vague. We disagree. The term "dangerous" is not a new concept in the criminal law. A district court is constantly faced with making this finding whenever it is granting, denying or setting bail. In fact, the addition of this term simply grants greater protection to a defendant since the statute would most likely be constitutional without this additional requirement. It is also worth noting that the statute does not make it a criminal offense to be dangerous, but rather is directed against criminals convicted—not of being dangerous—but of having violated a law of the United States. *See United States v. Stewart,* 531 F.2d 326, 336 (5th Cir. 1976); *cf. Lanzetta v. New Jersey,* 306 U.S. 45, 59 S.Ct. 618, 83 L.Ed. 888 (1939).

## C. SPECIFIC ERRORS RAISED BY THE DEFENDANT

▮▮▮ The defendant launches several attacks against the dangerous special offender statute, but most of these alleged errors can be disposed of quickly in light of our preceding discussion. The first error raised by the defendant is that the statute was applied in violation of the Fifth Amendment double jeopardy prohibition because it allowed Judge Roettger to reconsider all the worst aspects of the defendant's prior convictions. We feel that no error has been committed, and that this situation is controlled by this Court's decision in *Woodward v. Beto,* 447 F.2d 103 (5th Cir. 1971), which held that enhancement by reason of prior convictions does not offend the double jeopardy prohibition. The defendant further alleges that the double jeopardy prohibition was violated because Judge Roettger considered at the sentencing hearing two prior firearms convictions which had been overturned on appeal. In fact, Judge Roettger recognized the general rule that invalid convictions may not be used to enhance punishment, but he went on to state that he "can consider the facts of the possession of these weapons as matters relating to Title 18, U.S.C. § 3575(e)(2), (e)(3), and (f)." We agree with Judge Roettger. At a sentencing, a Court can consider many matters that might not be admissable at a trial including evidence of crimes for which the defendant has been indicted but not convicted, and evidence of other crimes. Such consideration does not constitute double jeopardy since the defendant is not punished a second time for the same offense, but the repetition of criminal conduct aggravates his guilt and justifies heavier penalties when he is again convicted. Even *facts* disclosed during the course of a prior trial which ended in an acquittal or was reversed on appeal can be considered by the Court. *United States v. Sweig,* 454 F.2d 181 (2nd Cir. 1972). A conviction which was reversed on appeal cannot of course be used as one of the "prior" convictions which trigger the implementation of the enhancement statute under the recidivist provision of § 3575(e)(1). Judge Roettger recognized this and only used the facts underlying the reversed convictions when he felt they were probative in determining

presence or absence of an identified fact without assuming the burden of proving the presence or absence of that fact, as the case may be, beyond a reasonable doubt. In our

view, the *Mullaney* holding should not be broadly read.
*Patterson v. New York,* —— U.S. ——, ——, 97 S.Ct. 2319, 2329 (1977).

**1175**

whether the defendant was either a "special offender" under (e)(2) and (e)(3), or "dangerous" as defined in (f). We hold that Judge Roettger committed no reversible error in using this information in such a manner.

■ The defendant's second attack against the statute alleges that the "dangerous" standard is unconstitutionally vague, and that the statute was applied in violation of the defendant's Fifth Amendment due process guarantee, and his Sixth Amendment right to trial by jury and confrontation. As we have previously noted, the "dangerous" standard is not unconstitutionally vague, and subsection (e)(1), which allows enhancement for certain repeat offenders, does not offend the Fifth Amendment due process guarantee or the Sixth Amendments rights to trial by jury and confrontation.

■ The next error the defendant raises is that using the recidivist provisions of § 3575(e) to enhance what is already a recidivist statute contravenes legislative intent and violates double jeopardy. The defendant contends that the act was aimed at controlling major gambling activities—not unauthorized possession of firearms—and to employ the act in this case contravenes legislative intent. The defendant also asserts that he is already being punished as a recidivist under the Firearms Act since his possession would not have been illegal if he had not been previously convicted of a felony. He contends that twice punishing him for being convicted of a felony violates double jeopardy. The defendant, however, fails to cite us any authority excluding the firearms provisions from the scope of the enhancement statute. The mere fact that the legislation was initially prompted by a desire to curb major gambling activities of organized crime, does not mean that there was a legislative intent to exclude from sentencing under this statute the crimes the

defendant was found to have committed. Also, the statute does not violate the double jeopardy clause for the same reason that recidivist statutes have traditionally been held constitutional—that is, the increased punishment does not represent punishment for the earlier crimes, but rather the fact of the earlier crimes aggravates the commission of the latest crime warranting imposition of the longer sentence.

■ The final error the defendant raises on appeal [8] is that he was denied his constitutional right to self representation at the sentencing hearing. Prior to the sentencing hearing, the defendant filed a *pro se* motion for leave to proceed as co-counsel because he was allegedly dissatisfied with his court-appointed attorney. The defendant seeks to extend the holding in *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), which affirmed a person's constitutional right to act as his own counsel. The defendant contends that this right to self representation necessarily comprehends the right to act as co-counsel. We do not agree. The defendant here did not want to dispense with his own counsel, but rather he wanted to engage in his own questioning while still enjoying court-appointed counsel. A district court cannot act with any efficiency where witnesses are questioned both by attorneys and by defendants. *Faretta* does not hold that a defendant has a Sixth Amendment right to act as co-counsel, and we are not willing to extend the reach of the Sixth Amendment to include such a right.

## V. THE APPEAL OF THE UNITED STATES

■ The Government appeals the district court's granting of a judgment of acquittal as to Count III of the indictment. The judgment of acquittal was based upon an insufficiency of evidence to support the jury's verdict of guilt, and the Govern-

---

**8.** The defendant also alleged on appeal that there was insufficient evidence to find him a special offender under subsection (e)(3). Since the defendant is a special offender under (e)(1), there is no need to consider this point.

ment's failure to establish venue within the Southern District of Florida. After a review of the whole record, we feel that the trial court's judgment of acquittal was proper.

The judgment of the district court is AFFIRMED in all respects.