/s/ John Petruska
FILED WITH THE            MAYOR, CITY OF PARMA,
MAYOR: January 9, 1980     OHIO

UNITED STATES of America, Plaintiff-Appellee,

v.

**Timothy KINNEY, Defendant-Appellant.**

**No. 79–5247.**

United States Court of Appeals, Sixth Circuit.

Argued April 18, 1980.

Decided Jan. 15, 1981.

Rehearing Denied Feb. 13, 1981.

Thomas L. Jacobs, (court-appointed CJA), Russell Bensing, Cleveland, Ohio, for defendant-appellant.

Timothy Kinney, pro se.

James R. Williams, U. S. Atty., John M. Siegel and R. J. Stidham, Cleveland, Ohio, for plaintiff-appellee.

Before EDWARDS, Chief Judge, and KENNEDY and JONES, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

Timothy Kinney appeals from a jury conviction for aiding and abetting a bank robbery by force in violation of 18 U.S.C. § 2113(a). Two searches of Kinney's residence produced evidence which contributed to his conviction. Because the second search was constitutional and based upon untainted evidence, we affirm the district court's judgment.

### I.

On February 22, 1979, Kenneth Workman robbed the Superior Savings and Loan Association in East Cleveland, Ohio. When a teller unlocked the door to begin the morning's business, Workman forced his way into the bank at gun point. Moments thereafter, a bank teller who knew Kinney saw him in front of the bank. She went into the bank just as the robbery began. After locking the tellers in the vault, Workman escaped with $36,500 in unmarked currency.

The teller who knew Kinney identified the robber as someone named "Kenny" whom she had seen in the bank with Kinney. FBI agents got Kinney's address from the bank and went to that address, which was Kinney's mother's home. Kinney arrived while the agents were speaking to his mother and admitted being at the bank that morning. He told the agents that he had been convicted of shooting his brother-in-law. Kinney also told the agents that he lived with his girlfriend in her apartment on Faye Street.

After agreeing to show the agents where "Kenny" lived, Kinney accompanied them to another neighborhood where he pointed out a house. A resident of a different house in the same neighborhood told them that his brother-in-law was named Kenny Workman. The description of Workman matched that of the bank robber. Subsequently, three of the tellers identified Workman as the bank robber.

On March 1, 1979, when Workman was arrested, he told agents that he and Kinney discussed the bank robbery and that they went to the bank together on the morning of the robbery. After the robbery they divided the money at Kinney's girlfriend's apartment.

An arrest warrant was issued for Kinney. Not certain which apartment belonged to Kinney's girlfriend, agents saw Kinney's car parked behind an apartment on Faye Street and placed it under surveillance. Later a man entered the car and drove off, and after several miles it was stopped by agents. Upon being questioned the driver identified himself as a friend of Kinney's. He told the police no one was at the apartment, and that he had borrowed the car from Kinney before Kinney went to work.

The agents returned to the apartment where Kinney lived with his girlfriend in the downstairs apartment of the two story building. Assisted by local police, the agents surrounded the building. Eight men participated in the arrest: three went behind the apartment; two went to a side door; and three went to the front door.

The agents at the front, side, and back of the apartment knocked on the doors and said, "FBI, open up." The agent at the back door heard someone ask, "Who's there," and heard a scuffling sound. The agent at the side door heard a male voice ask, "Who's there?" The agent replied, "FBI, open up." He saw a hand pushing a curtain away from the window next to the door. The agent at the side door then prepared to force his way in.

The agent at the front door testified that after he knocked on the door he waited several minutes. When the front door opened and the agent said, "Timothy, FBI," Kinney started to close the door. The agent then grabbed Kinney's arm and pulled him out of the apartment onto the porch. He was arrested and handcuffed while on the porch.

The agents at the side and back doors of the apartment subsequently entered the apartment through the front door. As a crowd gathered outside the apartment, the arresting agent took Kinney back into the house instead of placing him in a car and exiting from the scene. The reason given was the presence of the crowd and because Kinney's shirt was unbuttoned.

Agents entered the apartment before Kinney and the arresting officer and conducted a protective sweep. Its alleged purpose was to protect the agents from anyone who might be in the apartment. During the sweep the agents examined the rooms and closets closely enough to determine that no one else was in the apartment. The agents confiscated a gun and some cartridges which were in plain view. The agents then made a sweep of the basement and the upstairs apartment.

Kinney's girlfriend was reached by telephone by agents who asked for her permission to search the apartment. She refused. Upon her refusal to consent, agents then secured the apartment, took Kinney to the FBI office, and successfully sought a search warrant. The warrant which issued was based on an affidavit which mentioned the gun found during the protective sweep.

Kinney contends that the protective sweep was unlawful because the agents had no lawful reason to enter his apartment after the arrest. He asserts that the search warrant which issued was based on evidence which was seized unlawfully. The district court held that the agents' sweep of the apartment was lawful because of the agents' fear of potential danger.

## II.

### PROTECTIVE SWEEP

■ The Fourth Amendment of the Constitution prohibits unreasonable searches and seizures. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1964); *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). Absent extraordinary circumstances, government agents have no right to search a dwelling when an arrest is effectuated outside it. *Vale v. Louisiana*, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). The Supreme Court recently reaffirmed this principle:

> In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In *Payton*, police officers entered a home with probable cause to arrest the occupant, but without an arrest warrant. *Payton* makes clear that, in invading the privacy of a person's home, government agents must show an exigent circumstance of constitutional magnitude.[1] In this case, there were no exigent

---

1. The Supreme Court held in *Vale v. Louisiana*, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970), that the burden to show the existence of an exception to the requirements for a warrant rests with the Government. The Court in *Vale* listed five exceptions:

(a) consent, (b) police responding to an emergency, (c) hot pursuit, (d) goods in the process of destruction, and (e) objects about to be removed from the jurisdiction.

circumstances which meet the burden required to justify a warrantless search.

The Government vigorously argued at oral argument and in its brief that the search was justifiable because the FBI agents had a reasonable fear of potential danger from others inside defendant's apartment. However, even if they made this arrest inside the apartment pursuant to an arrest warrant, agents could only have searched the immediate area within the defendant's control. *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The decisions which hold that police officers have a right to make protective sweeps of an arrested persons residence are distinguishable. In those cases the police had grounds to believe that there were other persons inside the residence who were potentially dangerous. *United States v. Bowdach*, 561 F.2d 1160 (5th Cir. 1977); *McGeehan v. Wainwright*, 526 F.2d 397 (5th Cir. 1976); *United States v. Sellers*, 520 F.2d 1281 (4th Cir. 1975), *vacated on other grounds*, 424 U.S. 961, 96 S.Ct. 1453, 47 L.Ed.2d 728 (1975); *United States v. Smith*, 515 F.2d 1028 (5th Cir. 1975). In *Bowdach*

and *Smith*, armed accomplices were not in custody and the searches resulted in the arrest of those accomplices. Similarly, in *Sellers* the defendant was allegedly traveling with armed confederates. These cases establish that protective sweeps are lawful only if a serious and demonstrable potential for danger exists. *United States v. Smith*, 515 F.2d at 1031.

▮ In contrast, no objective facts support a reasoned fear on the part of the FBI agents at the defendant's apartment.[2] The agents had already arrested the defendant's only accomplice. In fact, at the time of the arrest and the initial search of the residence Workman was already in custody. No weapons were brandished by anyone in the house and there were not any cars around the apartment. An opposite holding would permit government agents to infer danger from any occupied dwelling. The indicia of danger in this case, the movement at the window and the noise at the back door, are likely to occur in any occupied dwelling. These noises do not constitute a physical threat. Therefore, we hold that the

**2.** Judge Kennedy would uphold a protective sweep on facts that report only a part of the record. The dissent seeks to justify the search on the possible presence of a dangerous person by noting that the defendant "had been observed in the company of other young men, one of whom, Mr. Westbrook, had just left the residence, and was on parole for armed robbery ..." and another associate, Kenneth Workman, a confessed bank robber. To give a complete picture, we must add several other facts from the record: the government agents had briefly interrogated the defendant on an earlier occasion without incident; the agents knew at the time of arrest that the defendant had not performed the armed robbery; and Westbrook had been stopped moments before defendant's arrest and quizzed without incident. The record viewed in its entirety demonstrates no exigent circumstance that would permit a warrantless search.

In addition, the dissent has misread the Supreme Court's decisions in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), as vindicating broad intrusions into the defendant's home. The Supreme Court in *Chimel* permitted the police officers to perform a very limited search of the area within the reach of an arrested person. *Terry* permits police officers to frisk

suspected criminals in public. In this case, the defendant was handcuffed on the porch outside his apartment, so that nothing inside the apartment was within his reach.

Obviously, the Constitution does not limit the government officers' rights to protect themselves from assault when their fear is reasonably based on objective facts. However, as Judge Kennedy admits, the Courts of Appeal which have considered this question have almost uniformly held that significant indicia of danger must be present to warrant a protective sweep. The record shows the absence of any such indicia in this case. Citizens have a right to be free from any unnecessary government intrusion. The dissent suggests that *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), authorized the agents to go back into defendant's apartment. Since the record uncontrovertably demonstrates that the arrest was accomplished on the porch outside of the dwelling, *Payton* provides no basis for entry. In fact, *Payton* made clear that, even with probable cause, the government must first secure an arrest warrant in order to invade the privacy of a defendant's home. The limiting language in *Payton* cannot be transmitted into the basis for eviscerating the Fourth Amendment safeguards established in *Chimel* and its progeny.

government has failed to demonstrate exigent circumstances which would justify a warrantless search.

■ The government also contends that it was necessary to enter Kinney's apartment because he was not fully clothed and because a crowd formed outside his home. Neither contention has merit. The defendant did not request permission to secure additional clothing and did not consent to an entry of his home. Entry cannot be justified on these grounds. *See, United States v. Mason*, 523 F.2d 1122 (D.C.Cir. 1975). The crowd outside the apartment was not threatening. If the FBI agents' wished to protect themselves from the crowd, leaving promptly with the defendant would have been the prudent action to take. Judge Kennedy's suggestion that "March" weather justified taking the defendant back into his house is not supported by the record. There is no evidence that the defendant gave the police permission to enter his home. In fact, as discussed above, the agents unsuccessfully attempted to get permission for a search from Kinney's girlfriend before securing a warrant for the second search of his apartment.

The second search was constitutional. The government included fruits of the illegal search in the affidavit submitted to obtain the search warrant for the defendant's apartment. However, substantial evidence which was not tainted by the search supported the search warrant for the defendant's residence. The search warrant is invalid and the defendant is entitled to a new trial without the illegally seized evidence only if tainted evidence is of more than minor importance. *United States v. Grunsfeld*, 558 F.2d 1231 (6th Cir. 1977).

Accordingly, the judgment of the district court is AFFIRMED.

EDWARDS, Chief Judge, concurring.

Our panel unanimously holds that the conviction in this case must be affirmed because of the validity of the search warrant as outlined in Judge Jones' opinion, and the nature of the evidence produced as a result of the search warrant.

I also concur in Judge Jones' analysis of the original entry, and agree that since the arrest had been effectuated on the porch, there was neither necessity nor exigent circumstances under *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), nor consent, actual or implied, to authorize the warrantless entry.

I am afraid I regard my colleagues' discussion of the sweep search issue as dicta, as to which I feel no need to comment [1] beyond observing that where the entry is unlawful, any subsequent search is clearly unlawful also.

KENNEDY, Circuit Judge, concurring in part and dissenting in part.

I concur in that portion of the majority opinion which holds that there was probable cause for issuance of the search warrant without inclusion of any information obtained during the sweep of the premises at the time of defendant's arrest. However, because I would hold that the entry into Mr. Kinney's residence was not unlawful and that a cursory sweep of his premises for the protection of the arresting officers was justified under the circumstances, I cannot join in the remainder of the majority's opinion.

The FBI agents had an arrest warrant for Kinney. They did not know his exact address but did locate his automobile behind a residence at 1775 Fay, East Cleveland. Agent Hamilton testified that he observed a man leave the residence and enter the automobile. He and another agent followed the car. Hamilton testified, "Once we observed that this (the driver of the car) was not Timothy Kinney, we asked Mr. Westbrook where Timothy Kinney was." Westbrook told them that Kinney had loaned him the car. Westbrook also told them he had been convicted of armed rob-

---

1. I have previously stated my views on the protective search issue in the context of a case where there was lawful entry. *See United*

*States v. Chapman*, 549 F.2d 1075, 1078–79 (6th Cir. 1977).

bery. The agents then returned to Fay Street.

There five FBI agents, assisted by three uniformed city police officers with shotguns, made the arrest. Two agents were placed at the rear of the home, one at a side exit, and two in front. The uniformed officers were placed one at the rear, one at the side, and one in front. Agent Hamilton pounded on the front door and announced his presence. There was some delay before the door was opened by defendant. On seeing Agent Hamilton, who had spoken to him the day before, defendant tried to shut the door. Hamilton pulled defendant out the door onto the front porch of the two-story, two-family residence, where he was handcuffed. Kinney was not fully dressed. A crowd was gathering. Hamilton, therefore, took Kinney back into the residence, where he was read his constitutional rights and the arrest completed. Agents made a cursory search or sweep through the premises to look for other individuals. The district court found that the agents checked closets but did not open drawers and cabinets. The facts are sparse because the suppression hearing was largely concerned with whether the officers thoroughly searched the house at that time or later, after they secured the search warrant. A gun was found on the bed in the bedroom where the television was playing. No one was found in the house, although agents heard noises in the rear of the house and observed movement at a window.

The arrest warrant authorized the agents to enter Kinney's residence to effect his arrest. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Because the agents had pulled Kinney through the doorway onto the porch when he started to shut the door, the majority would prohibit the officers from entering the premises without first securing Kinney's permission. It is doubtful that anyone would consider it necessary to ask Kinney whether he wished to reenter the house when he had been pulled through the doorway, not fully clothed, on March 2, in East Cleveland, Ohio.

The officers testified that they reentered the residence for the additional reason that the sight of police with shotguns caused a crowd to gather. The majority holds that this was an insufficient reason to reenter unless the crowd was menacing. A prudent police officer should not wait to determine whether the crowd is friendly or unfriendly where any problem could be avoided by simply stepping inside the door. The conduct of the officers in permitting defendant to complete dressing and completing the arrest inside with an advice of rights is as reasonable as, if not preferable to, the procedure suggested by the majority of whisking the defendant away.

Further, I would hold that a sweep of defendant's flat was justified under the circumstances of this case.

I recognize that in most of the cases approving of a sweep the threat to the police was greater than their apprehension here. *But see United States v. Briddle*, 436 F.2d 4 (8th Cir. 1970). As stated by the Ninth Circuit in *United States v. Gardner*, 627 F.2d 906, 909–10 (9th Cir. 1980):

> When officers have arrested a person inside his residence, the exigent circumstances exception permits a protective search of part or all of the residence when the officer reasonably believe that there might be other persons on the premises who could pose some danger to them.

The officers' apprehension for their safety here was justified. It was reasonable for them to conclude that there was another individual in the residence, in view of the observations of officers at the back of the premises. What they heard may well have been the television, which was on in the bedroom, but they would have no way of knowing that before conducting the sweep. The officers knew that Kinney had a record of serious offenses. He was being arrested for armed bank robbery. He had advised Agent Hamilton that he was on probation for shooting his brother-in-law. Kinney had previously been observed in the company of some other young men, one of whom, Mr. Westbrook, who had just left the resi-

947

dence, was on parole for armed robbery. The officers also knew another of his associates was Kenneth Workman, the other bank robber. Workman was in jail, of course, but he nonetheless provides a clue to Kinney's likely associates. The prudent officers ought to know the whereabouts of other persons in the residence including family members who might undertake to release Kinney under some misguided notion of helping him.

There is nothing in this case to indicate that either the entry or the sweep were pretextual. The officers gave uncontradicted testimony as to the reason for the sweep and the manner in which it was conducted. The occupation of a police officer is perilous enough even when officers are permitted to take reasonable precautions for their safety. The additional intrusion into Kinney's privacy interest was slight. The Supreme Court has endorsed such slight intrusions for the purpose of protecting the police. For instance, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), permits a protective search for weapons in the case of a stop. *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), permits the opening of drawers in the vicinity of an arrested defendant for the protection of the arresting officers. Since the officers' apprehension was reasonable and the precautions they took were reasonable, I would hold the sweep lawful.

I would, therefore, affirm the judgment of the district court for these additional reasons.