**UNITED STATES Of America,**
**Plaintiff,**

v.

**Ramon SAPP, Defendant.**

**No. CR 02–0092 MHP.**

United States District Court,
N.D. California.

May 15, 2003.

Shawn Halbert, Federal Public Defender's Office, San Francisco, CA, for defendant.

Andrew M. Scoble, U.S. Attorney's Office, Criminal Div., San Francisco, CA, George L. Bevan, Jr. U.S. Attorney's Office, San Francisco, CA, for U.S.

## OPINION

PATEL, Chief Judge.

Defendant Ramon Sapp stands charged with multiple federal firearms violations, 18 U.S.C. §§ 922(g)(1), 924(c)(1)(A), as well as two counts of attempting to kill persons assisting federal officers in the performance of their duties, 18 U.S.C. § 1114,

after a gun battle allegedly erupted when local police officers attempted to apprehend Sapp under the auspices of a federal warrant. Sapp first moves to dismiss the charges under 18 U.S.C. section 1114, maintaining that the protections of that statute do not extend to the present case, in which local officers sought to execute a federal warrant without direct involvement of federal officials. Sapp also moves to exclude evidence seized during the arrest on grounds that the arrest was unlawful because the local officers were not properly authorized to execute the federal warrant. Having considered the arguments and submissions of the parties, and for the reasons set forth below, the court rules as follows.

*BACKGROUND*

Ramon Sapp became the focus of a federal criminal investigation in January 2002. On January 10, 2002, the U.S. Attorney's office in San Francisco held a meeting with state and local law enforcement officers to address the issue of the "Thomas Paine" street gang which allegedly operated in the Western Addition area of San Francisco. Lagarejos Dec. ¶ 2. Regular meetings on the Thomas Paine gang followed. *Id.* The meetings were attended by representatives of the California Bureau of Narcotics Enforcement ("BNE"); the San Francisco Police Department ("SFPD"); the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"); and the Office of the United States Attorney for the Northern District of California.[1] Lagarejos Dec. ¶ 2; Nastari Dec. ¶¶ 2–3.

At this first meeting, Sapp was specifically identified as an enforcer for the Thomas Paine gang. Lagarejos Dec. ¶ 2. State and local officials already had been trying to arrest Sapp for approximately eight months because Sapp was wanted on a state parole warrant and was a suspect in numerous shootings in San Francisco. Nastari Dec. ¶ 5.

On January 18, 2002, during the course of a meeting of Operation Ceasefire—a local antiviolence initiative intended to bring federal, state and local agencies together to target hot spots of violence or gang activity—Sapp was identified by law enforcement officials as a suspect in the shooting of two individuals on January 15, 2002. Lagarejos Dec. ¶¶ 3, 4(a). Assistant U.S. Attorney George Bevan, who had hosted the January 10 meeting on the Thomas Paine gang and attended the January 18 meeting of Operation Ceasefire, began an effort specifically directed at apprehending Sapp. The following day, Bevan chaired a meeting at the U.S. Attorney's office in San Francisco concerning Sapp. Lagarejos Dec. ¶ 4(b), 5; Loftus Dec., Exh. 1.

On January 21, 2002, the U.S. Attorney's office opened a criminal complaint against Sapp for a federal weapons violation under 18 U.S.C. section 922(g)(1), and obtained approval for the complaint and a no-bail arrest warrant from a magistrate judge the following day. At a meeting on January 23 regarding the Thomas Paine gang, Bevan informed participants of the federal warrant for Sapp's arrest and established that the attending agencies should make it a priority to arrest Sapp, as well as to resolve the January 15 shootings in order

---

**1.** The government has included affidavits from several federal, state, and local law enforcement officers describing their roles in the investigation, including: Lawrence Lagarejos, Special Agent for BNE; Martin Halloran, Sergeant Inspector with SFPD; David Nastari, Police Officer, SFPD; Al Mabanag, Special Agent, ATF; David Loftus, Special Agent, ATF; Dennis Downs, Special Agent, ATF. In addition, the government refers to Inspector Michael Hamilton of the SFPD, who is cross-designated as a Special Deputy U.S. Marshal assigned full time to ATF. Lagarejos Dec. ¶ 5.

to charge Sapp in federal court. Lagarejos Dec. ¶ 6; Nastari Dec. ¶ 5.

On January 25, the SFPD issued a Crime Bulletin showing Sapp's picture under the heading "Federal Arrest Warrant Issued." Lagarejos Dec., Exh. 3. The bulletin also noted that Sapp was wanted by the California Department of Corrections for a parole warrant, but directed arresting officers not to search Sapp's vehicle or residence and instead to freeze the scene and allow federal investigators to respond and process all evidence. *Id.*

Between January 24 and February 1, AUSA Bevan authorized five separate subpoenas for telephone records in connection with the search for Sapp and the investigation of the Thomas Paine gang. Bevan Dec., Exhs. 1–5. Agents of the BNE and SFPD continued to search for Sapp throughout January and February. Lagarejos Dec. ¶¶ 11, 13; Nastari Dec. ¶¶ 6, 7, 9. Although federal agents participated in the search for Sapp by conducting occasional "spot checks" on a residence in Pittsburg, California, where Sapp was suspected to be hiding, ATF Agent Mabanag and AUSA Bevan agreed that state and local officers were better suited for attempts to locate Sapp due to their familiarity with the area and with Sapp himself. Mabanag Dec. Exh. 1.

On or about February 7, BNE Agent Lagarejos met with AUSA Scoble and discussed the possibility of releasing $6,409 that the SFPD had seized from alleged Thomas Paine gang leader Sofalo Brown in January. Lagarejos hoped that once Brown appeared to claim the money, he would lead investigators to Sapp. Lagarejos Dec. ¶ 12. AUSA Scoble gave his approval to this plan. *Id.* None of the evidence presented indicates that state or local officers received any instructions from the U.S. Attorney's office or any other federal agents between February 7 and Sapp's arrest on February 27.

On February 27, 2002, BNE and SFPD agents put Agent Lagarejos' plan into effect in a surveillance operation designed to locate and, if possible, arrest Sapp. Lagarejos Dec. ¶ 15; Grand Jury Testimony of SFPD Officer Brian Peagler, Bevan Dec., Exh. 7 ("Peagler Testimony"), at 48–49. Only BNE and SFPD agents participated in this operation. BNE and SFPD agents were briefed at the BNE office in San Francisco on the day of the operation. Lagarejos Dec. ¶ 15. SFPD returned $6,409 to Brown at the Hall of Justice in San Francisco. Using SFPD unmarked cars and an airplane, agents followed Brown and another alleged Thomas Paine member, Jamal Gregory, to the parking lot of a restaurant in the area of 108th Street and MacArthur Boulevard in Oakland. Peagler Testimony, at 50–52. A second vehicle met Brown's vehicle, and a man that agents identified as Sapp helped Brown into a white Honda and then entered the car himself. Agents followed the Honda until it pulled to a halt on the 35th Avenue exit from northbound Highway 580. The man identified as Sapp got out of the car. Grand Jury Testimony of SFPD Officer Nastari, Bevan Dec., Exh. 8 ("Nastari Testimony"), at 83–85; Grand Jury Testimony of SFPD Sergeant Inspector Halloran, Bevan Dec., Exh. 9 ("Halloran Testimony"), at 108–10. When SFPD Officers Nastari and Halloran exited their vehicles and ordered Sapp to stop, Sapp allegedly pulled a gun from his waistband and fired at them. Nastari Testimony, at 85–87; Halloran Testimony, at 110–12. Agents returned fire at Sapp as he ran into a nearby gas station, shooting him multiple times. Nastari Testimony, at 87–91; Peagler Testimony, at 53–56. SFPD Incident Report, Exh. H. Agents arrested Sapp and recovered a Beretta 9mm semiautomatic pistol from his vicinity. Sapp suffered severe gunshot wounds, resulting in the amputation of part of his leg and the loss of the use of one arm.

On March 28, 2002, a federal grand jury returned an eight-count indictment against Sapp charging him with offenses that occurred on three separate occasions. Count One alleges that on September 20, 2000, Sapp possessed a firearm having been convicted previously of a felony, in violation of 18 U.S.C. section 922(g)(1). Counts Two and Three also set forth illegal possession of firearms charges which allegedly occurred between January 15 and January 22 of 2002 in connection with the shooting of two private individuals. Defendant does not challenge any of these charges in the present motion.

Counts Four through Eight concern the events surrounding Sapp's arrest on February 27, 2003.

Based on the shots Sapp allegedly fired at Officer Nastari and Sergeant Halloran of the SFPD immediately prior to his arrest, the government charged Sapp with two counts of attempting to kill persons assisting an officer of the United States in the performance of his duties, in violation of 18 U.S.C. section 1114. The indictment also includes attendant charges alleging use of a firearm in relation to a crime of violence, 18 U.S.C. section 924(c)(1)(A), and unlawful possession of a firearm by a felon, 18 U.S.C. section 922(g)(1).

## DISCUSSION

I. *Applicability of 18 U.S.C. Section 1114 to Attempted Killing of State and Local Officers*

Sapp challenges on several grounds the two charges of attempting to kill persons assisting an officer of the United States in the performance of his duties under 18 U.S.C. section 1114. First, Sapp argues that section 1114 cannot be read to protect the state and local law enforcement officials against whom he allegedly fired, because the killing of state and local officers who are assisting in federal investigations is specifically addressed in another provision, 18 U.S.C. section 1121. Sapp also argues that because no federal officers participated in the operation leading to his arrest, Nastari and Halloran were not assisting a federal officer in the performance of his duties within the meaning of section 1114.

In interpreting a statute, a court begins with the language of the statute itself. *Northwest Forest Resource Council v. Glickman*, 82 F.3d 825, 831 (9th Cir.1996). The court must first determine whether the statutory language "has a plain and unambiguous meaning with regard to the particular dispute in the case." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)). "The inquiry ceases 'if the statutory language is unambiguous and the statutory scheme is coherent and consistent.'" *Id.*

The indictment charges Sapp with shooting at SFPD officers attempting to execute the federal arrest warrant under 18 U.S.C. section 1114, which provides in part:

> Whoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties, or *any person assisting such an officer or employee in the performance of such duties or on account of that assistance*, shall be punished....

18 U.S.C. § 1114 (emphasis added).

A. *Protection of State and Local Peace Officers Under Federal Law*

Sapp argues that despite the broad language in section 1114 protecting "any person" assisting federal officers, state and local police do not fall within the provision's protection under any circumstances.

Sapp bases his interpretation not on the text of section 1114 but on the existence of a separate provision, 18 U.S.C. section 1121, which provides for penalties for the killing, but not the attempted killing, of state and local officers. Section 1121 provides in part:

> (a) Whoever intentionally kills–
>
>> (1) a State or local official, law enforcement officer, or other officer or employee while working with Federal law enforcement officials in furtherance of a Federal criminal investigation–
>>
>>> (A) while the victim is engaged in the performance of official duties;
>>>
>>> (B) because of the performance of the victim's official duties; or
>>>
>>> (C) because of the victim's status as a public servant; or
>>
>> (2) any person assisting a Federal criminal investigation, while that assistance is being rendered and because of it,
>
> shall be sentenced according to the terms of section 1111, including by sentence of death or by imprisonment for life.

18 U.S.C. § 1121. Citing the legislative history of section 1121 and principles of statutory interpretation, Sapp argues that because section 1121 expressly addresses the killing of state and local officers explicitly, section 1114 should be construed not to proscribe the same conduct. Sapp concludes that the counts charging him with violations of section 1114 for the attempted murder of state and local police officers must be dismissed.[2]

Sapp first contends that by enacting section 1121 and its special protections for state and local law enforcement officials, Congress clearly demonstrated a belief that section 1114 did not apply to such officers. Addressing this argument requires a brief history of the two provisions. Congress originally imposed federal criminal penalties for the killing of United States officials during or on account of the official's execution of his duties in Section 1 of the Act of May 18, 1934, c. 299, 48 Stat. 780, which became the basis for 18 U.S.C. section 1114 and the parallel assault statute, 18 U.S.C. section 111. In so doing, Congress did not provide for general protection of all federal employees, but chose to punish only the killing of a specific list of law enforcement officers, such as U.S. marshals and their deputies, corrections officers, and revenue agents.[3] Over

---

**2.** Which provision may be used to charge Sapp is significant because section 1114 contains a provision penalizing attempted killing while section 1121 does not. "Attempt is only actionable when a specific federal criminal statute makes it impermissible to attempt to commit the crime." *United States v. Anderson,* 89 F.3d 1306, 1314 (6th Cir.1996), *cert. denied,* 519 U.S. 1100, 117 S.Ct. 786, 136 L.Ed.2d 728 (1997); *see also United States v. Rovetuso,* 768 F.2d 809, 821 (7th Cir.1985) ("There is no general Federal statute proscribing an attempt, and therefore it is actionable only where, as in the present case, a specific criminal statute makes it impermissible to attempt to commit the crime."), *cert. denied,* 474 U.S. 1076, 106 S.Ct. 838, 88 L.Ed.2d 809 (1986). The government agreed at oral argument that there is no general attempt provision that would apply to section 1121. Furthermore, it is clear from reading section 1114 and other federal penal statutes that Congress knows how to include the word "attempt" if it desires to do so. In the case of section 1121, it has not included attempt. No attempt provision can be therefore read into the plain language of section 1121, which unambiguously prohibits only intentional killing.

**3.** The act provided:

> [W]hoever shall kill ... any United States marshal or deputy United States marshal, special agent of the Division of Investigation of the Department of Justice, post-office inspector, Secret Service operative, any officer or enlisted man of the Coast Guard,

the years, Congress amended the statute on numerous occasions to add to the list of federal officials protected. By the time Congress passed section 1121 in 1994, section 1114 set forth a cumbersome list of protected federal officials.[4] The statute

> any employee of any United States penal or correctional institution, any officer of the customs or of the internal revenue, any immigration inspector or any immigration patrol inspector, while engaged in the performance of his official duties, shall be punished....
>
> Act of May 18, 1934, c. 299, 48 Stat. 780.

4. The full text of section 1114 in 1994 read as follows:

> Whoever kills or attempts to kill any judge of the United States, any United States Attorney, any Assistant United States Attorney, or any United States marshal or deputy marshal or person employed to assist such marshal or deputy marshal, any officer or employee of the Federal Bureau of Investigation of the Department of Justice, any officer or employee of the Postal Service, any officer or employee of the Secret Service or of the Drug Enforcement Administration, any officer or member of the United States Capitol Police, any member of the Coast Guard, any employee of the Coast Guard assigned to perform investigative, inspection or law enforcement functions, any officer or employee of the Federal Railroad Administration assigned to perform investigative, inspection, or law enforcement functions, any officer or employee of any United States penal or correctional institution, any officer, employee or agent of the customs or of the internal revenue or any person assisting him in the execution of his duties, any immigration officer, any officer or employee of the Department of Agriculture or of the Department of the Interior designated by the Secretary of Agriculture of the Secretary of the Interior to enforce any Act of Congress for the protection, preservation, or restoration of game and other wild birds and animals, any employee of the Department of Agriculture designated by the Secretary of Agriculture to carry out any law or regulation, or to perform any function in connection with any Federal or State program or any program of Puerto Rico, Guam, the Virgin Islands or any other commonwealth, territory, or possession of the United States, or the District of Columbia, for the control of eradication or prevention of the introduction or dissemination of animal diseases, any officer or employee of the National Park Service, any civilian official or employee of the Army Corps of Engineers assigned to perform investigations, inspections, law or regulatory enforcement functions, or field-level real estate functions, any officer or employee of, or assigned to duty in, the field service of the Bureau of Land Management, or any officer or employee of the Indian field service of the United States, or any officer or employee of the National Aeronautics and Space Administration directed to guard and protect property of the United States under the administration and control of the National Aeronautics and Space Administration, any security officer of the Department of State or the Foreign Service, or any officer or employee of the Department of Education, the Department of Health and Human Services, the Consumer Product Safety Commission, Interstate Commerce Commission, the Department of Commerce, or of the Department of Labor or of the Department of the Interior, or of the Department of Agriculture assigned to perform investigative, inspection, or law enforcement functions, or any officer or employee of the Federal Communications Commission performing investigative, inspection, or law enforcement functions, or any officer or employee of the Department of Veterans Affairs assigned to perform investigative or law enforcement functions, or any United States probation or pretrial services officer, or any United States magistrate, or any officer or employee of any department or agency within the Intelligence Community (as defined in section 3.4(f) of Executive Order 12333, December 8, 1981, or successor orders) not already covered under the terms of this section, any attorney, liquidator, examiner, claim agent, or other employee of the Federal Deposit Insurance Corporation, the Comptroller of the Currency, the Office of Thrift Supervision, the Federal Housing Finance Board, the Resolution Trust Corporation, the Board of Governors of the Federal Reserve System, any Federal Reserve bank, or the National Credit Union Administration, or any other officer, agency, or employee of the United States designated for coverage under this section in regulations issued by the Attorney General engaged in

not only failed to prohibit killing of all federal officers generally, but the list for the most part did not include penalties for the killing of persons who might be involved with federal law enforcement activities other than the federal officials themselves.[5]

While Sapp may be correct that the enactment of section 1121 against this statutory backdrop reflected a congressional judgment that state and local police officers were not generally protected under section 1114,[6] he ignores the fact that Congress passed legislation completely rewriting section 1114 shortly after the enactment of section 1121. In the amending section 1114 in 1996, Congress replaced the long list enumerating protected federal officers with general provisions prohibiting the killing of "any officer ... of the United States" or "any person assisting such an officer." Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, tit. VII, § 727(a) (codified in 18 U.S.C. § 1114). The post–1996 section 1114 thus defines the class of protected victims in a completely different manner than earlier versions, and Congress's view of the scope of the provision in 1994 does not illuminate the intended scope of the current version.

Sapp next contends that section 1121 should be read to provide exclusive regulation of the killing of state and local officers under the principle that "a more specific statute will be given precedence over a more general one, regardless of their temporal sequence". *Busic v. United States*, 446 U.S. 398, 406, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980), *superseded by statute on other grounds as recognized in United States v. Gonzales*, 520 U.S. 1, 10, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997). Canons of statutory interpretation, however, are guides to help courts determine congressional intent, which may be overcome by other circumstances evincing a different legislative purpose. *Chickasaw Nation v. United States*, 534 U.S. 84, 93, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001). In the case of overlapping criminal statutes, courts generally have allowed prosecution under either of two statutes which proscribe the same act, so long as the language and legislative history are consistent with a congressional intent that each statute should apply independently. *See Ball v. United States*, 470 U.S. 856, 860, 105

---

or on account of the performance of his official duties, or any officer or employee of the United States or any agency thereof designated to collect or compromise a Federal claim in accordance with sections 3711 and 3716–3718 of title 31 or other statutory authority shall be punished as provided under sections 1111 and 1112 of this title, except that any such person who is found guilty of attempted murder shall be imprisoned for not more than twenty years.
18 U.S.C. § 1114 (1994) (amended 1996).

5. The exceptions to this rule are two clauses prohibiting the killing or attempted killing of "any United States marshal or deputy marshal *or person employed to assist such marshal*" and "any officer, employee or agent of the customs or of the internal revenue *or any person assisting him in the execution of his duties.*" 18 U.S.C. § 1114 (1994) (amended

1996) (emphasis added). While the present statute tracks the language of the previous clause pertaining to customs agents, the government does not point to any cases interpreting the term "assisting" in this context, nor did the court discover any.

6. Congress in 1994 would have little reason to think that section 1114 applied generally to protect state and local law enforcement officials. The text of section 1114 in effect in 1994 gave no reason to suggest general protection for state and local officers. As Sapp points out, the report of the House Judiciary Committee characterized section 1121 as a "new offense," suggesting that the killing of state and local police officers previously had not been generally proscribed. H.R.Rep. No. 103–466 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1801.

S.Ct. 1668, 84 L.Ed.2d 740 (1985); *United States v. Batchelder*, 442 U.S. 114, 119–20, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979); *United States v. Lande*, 968 F.2d 907, 912–13 (9th Cir.1992), *cert. denied*, 507 U.S. 926, 113 S.Ct. 1299, 122 L.Ed.2d 689 (1993); *United States v. Castillo–Felix*, 539 F.2d 9, 14 (9th Cir.1976) ("[W]here an act violates more than one statute, the Government may elect to prosecute under either unless the congressional history indicates that Congress intended to disallow the use of the more general statute.").

The government maintains that sections 1114 and 1121 operate independently to proscribe different, although overlapping, conduct. By the plain language of the provisions, each applies to the killing of local officers during federal criminal investigations. Neither provision purports to preempt application of section 1114 where section 1121 applies, much less in the case of attempted killing not covered by section 1121. Where the provisions overlap for the intentional killing of state or local law enforcement officers, they impose identical punishments. 18 U.S.C. § 1111, 1114, 1121(a). The provisions therefore can be interpreted to operate independently without conflict.[7]

Despite their partial overlap, sections 1114 and 1121 address slightly different conduct, further suggesting that the provisions were intended to operate independently. Section 1121(a)(1) provides narrower protections than section 1114 in some ways, by protecting only state or local law enforcement officers rather than "any person" and by protecting only those officers assisting only a federal *criminal* investigation rather than aiding in the performance of any federal official's duties. 18 U.S.C. §§ 1114, 1121(a)(1). For local officers involved with federal criminal investigations, however, the scope of activity that brings a victim under the protection of section 1121 is broader than the scope of section 1114. Section 1121 prohibits the killing not only of officers while "assisting" federal officials, but while those officers are engaged in the more broadly defined activity of working "with Federal law enforcement officials in furtherance of a Federal criminal investigation." *Id.* §§ 1114, 1121(a)(1). Because neither statute wholly subsumes the other, neither can be deemed the more general or the more

---

7. The case Sapp cites which find a direct conflict between two rules of law are distinguishable from the present statutes. Some cases address direct conflicts between criminal rules imposed under a statute granting general authority for a source of criminal law, on the one hand, and a statute creating specific criminal regulations on the other. *See United States v. Cowboy*, 694 F.2d 1228, 1234–35 (10th Cir.1982) (general statutory provision applying all criminal laws valid in land within exclusive control of the United States to Indian lands "[e]xcept as otherwise expressly provided by law" did not limit separate statutory provisions defining crimes specific to Indian lands); *United States v. Layne*, 847 F.Supp. 888, 892 (D.Utah 1994) (provisions authorizing Secretary of the Interior to promulgate rules and regulations for use of national parks did not allow issuance of rules imposing penalties for drug activity inconsis-tent with those set forth in comprehensive federal drug laws). Other cases address the difficulty arising when two statutes proscribing the same act call for different penalties. *See Busic, supra* (general dangerous weapons sentencing enhancement in 18 U.S.C. § 924(c) may not be used where the underlying substantive criminal violation contains its own weapons enhancement provision); *United States v. Bates*, 429 F.2d 557, 559–60 (9th Cir.) (defendant convicted of narcotics conspiracy must be sentenced under narcotics conspiracy statute rather than general conspiracy statute), *cert. denied*, 400 U.S. 831, 91 S.Ct. 61, 27 L.Ed.2d 61 (1970). Sections 1114 and 1121 each regulate specific conduct, but provide identical penalties where regulated conduct overlaps. Under these circumstances, the two provisions can operate independently, and a prosecutor may fairly charge under either.

specific, and neither clearly takes precedence over the other.

 Finally, Sapp invokes the rule of lenity in support of his position that section 1114 should be construed in his favor. It is well-settled that "[w]here there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant." *United States v. Hardy,* 289 F.3d 608, 614 (9th Cir.2002) (quoting *United States v. Bass,* 404 U.S. 336, 348, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971)). Where there is no ambiguity to resolve, however, the rule of lenity does not apply. *See United States v. Batchelder,* 442 U.S. at 121–22, 99 S.Ct. 2198 ("Where, as here, Congress has conveyed its purpose clearly, ... we decline to manufacture ambiguity where none exists."). Sapp has demonstrated no ambiguity in section 1114's prohibition of the killing of "any person" assisting federal officials that would require application of the rule of lenity in this case.

### B. *"Assistance" to Federal Officers*

Sapp maintains that even if section 1114 applies to the attempted killing of state law enforcement officers who are assisting federal officers, the conduct alleged in the indictment fails to state a violation of the section. Sapp argues that because the operation leading to his arrest was conducted solely by state and local agents without participation or even direct knowledge on the part of federal agents, the officers at whom he allegedly shot were not "assisting" federal officers within the meaning of section 1114.

When interpreting statutory language, courts give words their "ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import." *Williams v. Taylor,* 529 U.S. 420, 431, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) (citations and quotations omitted). "To assist" is defined as "to help ...; to work as an assistant to; to

accompany or attend." Chambers Dictionary 93 (1998). While "assisting" might be broadly defined as offering any help or benefit, the term generally connotes a role in which the person providing assistance does not act independently, but operates under the direction of or in conjunction with the individual being assisted.

Section 1114 and the parallel assault statute, 18 U.S.C. section 111, have been applied to punish attacks on state or local officers in a variety of cases. In each of these instances, unlike the apprehension of Sapp, the state officers in question were either on loan to a federal agency (and therefore treated as federal officers) or acting in contemporaneous cooperation with federal officers. In *United States v. Smith,* 296 F.3d 344 (5th Cir.2002), the only case offered by the government interpreting the 1996 amendments to section 1114, the Fifth Circuit found that officers of the Dallas Police Department who came under fire while trying to apprehend a fleeing bank robber were protected under section 1114 because they were assisting an FBI agent who was also in pursuit of the robbers. The court rested its determination that the state officers were assisting the FBI agent on two grounds. First, the court found that the Dallas police officers were acting pursuant to a standing joint bank-robbery task force with the FBI, and that the Dallas police sergeant who supervised the car chase "knew that pursuit began with a bank robbery and that the [Dallas Police Department] and the FBI regularly work together on bank robbery cases." *Id.* at 347.

Also crucial to the *Smith* court's determination was the fact that a federal officer, FBI Agent Burkhead, had actively joined the chase before the shots which formed the basis of the section 1114 charge were fired. The court found that at the point at which the FBI officer joined the chase, "a

federal investigation was clearly underway, and by pursuing the bank robbery suspects, the Dallas police were assisting the FBI." *Id.* at 346–47. The court noted that although the suspects had also fired at Dallas police officers early on in the pursuit, they faced charges under section 1114 only for those shots fired after the federal officers had joined the chase. *Id.* at 347.

The government also relies on cases interpreting earlier versions of section 1114 (predating the 1996 introduction of the general "assisting" clause) that extended protection to state officers who were cooperating with federal officers. Several courts have applied section 1114 to attacks on state officials who were cross-deputized as federal agents or formally on full-time loan to federal agencies by deeming such individuals federal officers within the meaning of section 1114. *See United States v. Diamond,* 53 F.3d 249, 251–52 (9th Cir.) (protecting state officer cross-deputized as special deputy U.S. marshal and assaulted while on duty with FBI agent), *cert. denied,* 516 U.S. 925, 116 S.Ct. 326, 133 L.Ed.2d 227 (1995); *United States v. Chunn,* 347 F.2d 717, 720–21 & n. 9 (4th Cir.1965) (protecting state official on loan full-time to federal law enforcement agency). In other cases offered by the government, the state official in question was in the company of or under the direction of federal officers. *See United States v. Hooker,* 997 F.2d 67, 70, 74 (5th Cir.1993) (state officers participating in sting operation directed by DEA agent protected by section 1114 even where bulk of equipment, funding and personnel for operation came from state agencies); *United States v. Williamson,* 482 F.2d 508 (5th Cir.1973) (state officer hit with automobile while attempting to apprehend suspect in the company of two federal officers); *United States v. Heliczer,* 373 F.2d 241, 249 (2d Cir.) (local detective assaulted in police station by suspect arrested by federal officers was "acting in cooperation with and in aid of the federal officers"), *cert. denied,* 388 U.S. 917, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967). Finally, in several cases, individuals employed in facilities under contract to house federal prisoners were deemed protected under earlier versions of section 1114. *See United States v. Murphy,* 35 F.3d 143 (4th Cir.1994) (officer in local jail under contract with U.S. Marshal's service fell under section 1114's protection of any person "employed to assist" a U.S. Marshal or deputy marshal), *cert. denied,* 513 U.S. 1135, 115 S.Ct. 954, 130 L.Ed.2d 897 (1995); *United States v. Schaffer,* 664 F.2d 824 (11th Cir.1981) (per curiam) (guard in hospital under contract to serve federal prisoners protected as person assisting an officer or employee of the Department of Justice).

In the present case, a task force of federal, state and local law enforcement agencies had established as goals the investigation of the Thomas Paine gang and the location and arrest of Sapp. The U.S. attorney's office took up the issue of Ramon Sapp as part of a cooperative effort with state and local authorities after state and local officials had been seeking to arrest Sapp on an outstanding parole warrant for eight months. The U.S. Attorney's office played a significant role in the effort to apprehend Sapp–holding planning meetings with the other interested agencies, obtaining subpoenas for telephone records, and obtaining a federal arrest warrant. Federal officers from ATF also performed a few "spot checks" for Sapp at his suspected locations in late January 2002.

Despite federal involvement in the search for Sapp, the actual operation to apprehend Sapp on the day in question involved no direct federal participation of any sort. Neither the U.S. Attorney's office nor other federal agents appear to have been aware of the BNE and SFPD

operation at the time it occurred. BNE Agent Lagarejos states in his declaration that he mentioned the planned surveillance mission to AUSA Scoble nearly three weeks before it occurred and that Scoble approved of the general plan. Lagarejos Dec. ¶ 12. There is no evidence that the U.S. Attorney's office or other federal agents were involved or even informed of the surveillance activities after this point.

The apprehension of Sapp involved a markedly less prominent federal role than any case cited by the government in which section 1114 applied to protect state officers. Certainly, none of the state BNE of SFPD officers in question were cross-deputized, on loan to or under contract with a federal law enforcement agency. Nor were the officers in the immediate company or supervision of federal officers, as no federal officers were involved in any way with the surveillance and apprehension of Sapp on February 27.

The only link to federal officers in the present case is the joint task force of federal, state and local law enforcement that had taken up the investigation of the Thomas Paine gang and the capture of Sapp. No court has rested federal jurisdiction under 18 U.S.C. section 1114 purely on meetings between federal, state and local officers and which resulted in a general agreement as to common law enforcement goals. While the *Smith* court noted the existence of a joint bank robbery task force comprised of federal and state law enforcement as evidence of federal involvement, the court also placed substantial weight on the direct participation by federal officers in the operation in which state officers were attacked.

The government argues that section 1114 should protect state and local officers even where no federal officer is present, because the provision is intended to protect the federal law enforcement function as well as federal officers themselves. In *Ladner v. United States*, the Supreme Court considered the legislative intent behind a precursor to section 1114 and found that "the congressional aim was to prevent hindrance to the execution of official duty ... and was not to protect federal officers except as incident to that aim." 358 U.S. 169, 175–76, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958). In *United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975), the Supreme Court found that a similar concern with the federal law enforcement function grounded 18 U.S.C. section 111, the parallel assault statute to section 1114. The *Feola* Court looked to the text of the statute and reasoned that Congress's decision to list those law enforcement officers protected by section 1114–rather than simply to punish assault of any federal employee–reflected concern "with the safety of federal officers insofar as it was tied to the efficacy of law enforcement activities." 420 U.S. at 681, 95 S.Ct. 1255. The Court noted that an early draft of the provision that extended general protection to all employees of the federal government was rejected by Congress, presumably because the draft version "strayed too far from the purpose of insuring the integrity of law enforcement pursuits." *Id.* at 682, 95 S.Ct. 1255.

While relying on the purposes of section 1114 set forth in *Ladner* and *Feola,* the government fails to address the 1996 amendments in which Congress entirely rewrote the provision by replacing the lengthy enumeration of federal law enforcement officials covered by the statute with a general protection for all federal employees. This change eliminated the structural aspects of the provision upon which the *Feola* Court rested its conclusion that Congress intended to protect federal functions, and enacts in its place the *Feola* Court's counter-example of a statute that would indicate a congressional intent to protect only federal officials. Applying

the reasoning set forth in *Feola* to the current text therefore leads to precisely the opposite conclusion reached by that Court–that Congress designed the current statute to protect primarily federal officers themselves and had little concern for the federal law enforcement function independent of the harm to federal officers.[8]

■ A faithful reading of section 1114 requires an identification of a federal officer, not merely a federal function. The statute proscribes the killing or attempted killing of a federal officer or employee "while *such* officer" is engaged in official federal duties. 18 U.S.C. § 1114 (emphasis added). It extends the proscription to the killing or attempted killing of "any person assisting *such an officer.*" *Id.* (emphasis added). There is no such officer alleged in the indictment, nor could there be–the assistance was rendered to an effort not an official.[9] The indictment belies this by alleging the assistance was rendered to "officers of the United States and of agencies of the Executive Branch of the United States Government." Indictment at 2, 3. No specific officer is named. Nor does it appear, as suggested by the government at oral argument, that merely

inserting the name of an assistant United States Attorney or other federal employee of one of the participating agencies would satisfy section 1114. The "assistance" is far too attenuated for the reasons set forth in this opinion. By the statutory language, Congress clearly contemplated assistance to a particular officer or officers, not assistance to a task force or more generalized effort. Congress easily could have written section 1114 to protect persons rendering assistance to a federal effort or investigation as it did in section 1121, but chose not to do so. *See* 18 U.S.C. § 1121(a)(2) (prohibiting the killing of "any person assisting a Federal criminal investigation").

Even assuming that the present statute does protect the federal law enforcement function, the government does not explain how the apprehension of Sapp involves a federal rather than a state function. At the time of the operation, Sapp had outstanding state and federal warrants for his arrest and was as much a fugitive from state police as from federal police–even more so, as they had been pursuing him for months before federal authorities took an interest in his case. Although the government maintains that Sapp is a suspect in a num-

---

**8.** In light of the general assumption that Congress operates with knowledge of judicial interpretation of statutes, the 1996 amendments can be viewed as a rejection of the *Feola* Court's finding that section 1114 has the twofold purpose of protecting both federal law enforcement officers and federal law enforcement functions. None of the legislative history indicates that Congress intended to rewrite section 1114 while preserving existing precedent as to the purpose or reach of the statute. *See* H.R.Rep. No. 104–104–518 (1996), *reprinted in* 1996 U.S.C.C.A.N. 924, 956.

**9.** At oral argument, the government maintained that the apprehension of Sapp assisted either he Assistant U.S. Attorneys leading the investigation of the Thomas Paine gang or the ATF agents who were involved. The official duties of the U.S. Attorney simply do not include apprehending suspected criminals,

nor has any court found section 1114 to apply to persons so assisting federal prosecutors. The participating ATF agents played relatively minor, nonsupervisory roles in the investigation in which they performed limited "spot checks" and communicated with state and local officers. See Loftus Dec., Exh. (describing role of ATF Agent Loftus as attending planning meetings); Downs Dec. (describing role of lead ATF Agent Downs as attending meetings, driving by a possible address for Ramon Sapp on one occasion, exchanging information with BNE Agent Peter Bermudez, contacting ATF Special Response agents in Los Angeles to solicit help with telephonic and electronic surveillance of Sapp, and preparing statements and criminal charges in the wake of the Sapp's arrest). These ATF agents were in no way involved in the operation which lead to Sapp's arrest.

ber of shootings in the San Francisco area, it has yet to proffer any evidence supporting federal charges for those crimes. There is therefore scant evidence that the arrest of Sapp was designed to lead primarily to charges in federal court rather than state court.

The United States argues that courts have interpreted section 1114 liberally in favor of extending protections to law enforcement officials. The cases the government cites in support of this proposition interpret "liberally and with flexibility" only section 1114's requirement that the victim be attacked "while . . . engaged in or on account of the performance of official duties." *United States v. Holder*, 256 F.3d 959, 965 (10th Cir.2001) (citizen shot while returning from maintaining federal wetlands reserve with U.S. Department of Agriculture official was attacked because of assistance with officer's official duties); *see also United States v. Hoy*, 137 F.3d 726 (2d Cir.) (off-duty deputy U.S. Marshal assisting a woman whose purse had been snatched was engaged in official performance of his duties under sections 111 and 1114), *cert. denied*, 525 U.S. 850, 119 S.Ct. 124, 142 L.Ed.2d 100 (1998); *United States v. Clemons*, 32 F.3d 1504, 1507–08 (11th Cir.1994) (DEA agent who had pulled into gas station to call for pizza en route to late-night meeting to discuss search warrants was protected under pre–1996 version of section 1114), *cert. denied*, 514 U.S. 1086, 115 S.Ct. 1801, 131 L.Ed.2d 728 (1995). The breadth of activities in which a federal employee might be protected by section 1114 depends on a different set of concerns than the extent to which section 1114 protects non-federal officers. A liberal interpretation of the former does not require a liberal interpretation of the latter, and the government offers no principled reason why an expansive reading of one clause of the provision should allow this court to break new ground in interpreting another.

The state and local officers who apprehended Sapp acted independently of any federal officer. No federal officer supervised or participated in the operation. There is no evidence that any federal official even knew that the operation was occurring at the time Sapp was apprehended, or had discussed the apprehension of Sapp with state officials for nearly three weeks prior to the operation. At the time of his arrest by state officials, there were outstanding state and federal warrants for Sapp's arrest. Under these circumstances, the court finds that the state and local officers at whom Sapp allegedly shot were not "assisting" federal officers within the meaning of 18 U.S.C. section 1114 at the time of the shooting.

### III. *Authority of State and Local Officials to Execute Federal Arrest Warrant*

Sapp finally argues that the operation which lead to his arrest was an unlawful exercise of authority of local police officers outside of their jurisdiction and that the arresting officers therefore were not authorized to execute the federal warrant for his arrest. As a result, Sapp contends, the charges relating to his conduct during the arrest should be dropped and evidence resulting from his arrest suppressed.

### A. *Validity of Sapp's Arrest Under Federal Law*

Sapp first asserts that state and local police officers are not authorized by law to execute federal warrants. At the time of Sapp's arrest, Federal Rule of Criminal Procedure 4(d)(1) provided that an arrest warrant "shall be executed by a marshal or by some other officer authorized by law." F.R.Crim. P. 4(d)(1) (2002). Sapp does not cite a single instance in which an arrest by

state or local officials pursuant to a federal warrant has been ruled invalid.[10]

■ The only federal court to address the question found that local police officers are authorized to execute federal warrants. *United States v. Bowdach,* 561 F.2d 1160, 1167 (5th Cir.1977). State and local police generally are not precluded from enforcing federal law, *Gonzales v. City of Peoria,* 722 F.2d 468, 474 (9th Cir.1983), *overruled on other grounds by Hodgers–Durgin v. de la Vina,* 199 F.3d 1037 (9th Cir.1999). Accordingly, state and local officials may make arrests for violations of federal criminal law where permitted to do so by state law. *Gonzales,* 722 F.2d at 475; *see also* 18 U.S.C. § 3401 ("For any offense against the United States, the offender may, ... by any chancellor, judge of a supreme or superior court, chief or first judge of the common pleas, mayor of a city, justice of the peace, or other magistrate, of any state where the offender may be found, and at the expense of the United States, be arrested....."). As the *Bowdach* court recognized, the authorization granted state and local authorities to make arrests for violations of federal criminal law would only be made more legitimate "when the state officers have knowledge of the fact that the person being arrested is wanted by the federal authorities and that a federal arrest warrant has been issued for that person's arrest." 561 F.2d at 1168.

■ Relying on the principles articulated in *Printz v. United States,* 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), Sapp argues that allowing state authorities to execute federal arrests would injure principles of federalism and state sover-

eignty. In *Printz,* petitioners challenged the constitutionality of a "congressional action *compelling* state officers to execute federal laws." *Id.* at 905, 117 S.Ct. 2365 (emphasis added). Here, local authorities acted voluntarily to arrest Sapp, without compulsion from either federal legislation or federal executive action. The principles articulated by the *Printz* Court might prevent Congress from enacting statutes requiring local officials to execute federal arrest warrants, but neither federalism nor state sovereignty is implicated by state or local officers' voluntary execution of a federal warrant.

### B. Validity of Sapp's Arrest Under California Law

"[A]bsent an express federal statute defining who is allowed to execute federal arrest warrants, the validity of the arrest should be determined by the law of the state where the arrest took place." *Bowdach,* 561 F.2d at 1168. Sapp next maintains that his arrest was unauthorized under state law because the arresting officers were operating outside of their jurisdiction.

■ Under California law, "[a] peace officer may make an arrest in obedience to a warrant." Cal. Penal. Code. § 836(a). The authority of peace officers is defined in California Penal Code section 830.1, which provides:

(a) Any ... police officer ... is a peace officer. The authority of these peace officers extends to any place in the state, as follows:

.　　.　　.　　.　　.

10. The Ninth Circuit has addressed cases in which local officers executed federal warrants without commenting on their authority to do so. *See, e.g. United States v. Van Poyck,* 77 F.3d 285, 287 (9th Cir.) (defendant indicted on federal bank robbery charges arrested by California state officers), *cert. denied,* 519 U.S.

912, 117 S.Ct. 276, 136 L.Ed.2d 199 (1996); *United States v. Underwood,* 717 F.2d 482, 482 (9th Cir.1983) (local police arrested escapee from federal prison under the authority of a federal arrest warrant), *cert. denied,* 465 U.S. 1036, 104 S.Ct. 1309, 79 L.Ed.2d 707 (1984).

(2) Where the peace officer has the prior consent of the chief of police or chief, director, or chief executive officer of a consolidated municipal public safety agency, or person authorized by him or her to give consent, if the place is within a city or of the sheriff, or person authorized by him or her to give consent, if the place is within a county.

The government points out that the Chief of the Oakland Police Department has given standing consent pursuant to California Penal Code section 830.1(a)(2), that "any peace officer of [the San Francisco Police Department] shall have the authority of a peace officer at all times within the City of Oakland." Crosat Decl., Exh. A. This standing consent was in effect at the time of Sapp's arrest. *Id.*, ¶ 2, 3. The court therefore finds that SFPD officers who arrested Sapp were authorized to do so under California law.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss counts four through seven of the indictment, charging violations of 18 U.S.C. sections 1114 and 924(c)(1)(A), for failure to state violations of the named statutes is GRANTED. Defendant's motion to suppress evidence on count four through eight is DENIED.

IT IS SO ORDERED.